[Civil No. 4689. Filed June 4, 1945.]

[159 Pac. (2d) 776.]

TOM. J. RUSSELL, H. GRADY HARRISON and T. L. DANIEL, Appellants, v. THE GOLDEN RULE MINING COMPANY, an Arizona corporation, Appellee.

12

Messrs. Woolf & Shute, for Appellants.

Messrs. Jennings & Salmon and Mr. Ozell M. Trask, for Appellee.

MORGAN, J.—The appellee corporation was plaintiff below, and appellants were defendants. The parties will be designated as plaintiff and defendants. The construction of various contracts involving mining claims is required for a determination of the issues raised on this appeal. A pertinent statement of the facts and a reference to the agreements in the order of their execution are essential to a clear appreciation of the questions which have been presented to us.

The defendants owned three lode mining claims located in Maricopa County, known as the Little Daisy Group, consisting of Little Daisy Nos. 1, 2 and 3. Russell and Harrison owned jointly an undivided one-half interest, Daniel the remaining undivided one-half. On April 20, 1937, Daniel, as first party, entered into a contract with his co-defendants as second parties, covering his half interest. The contract provided:

"That the party of the first part for and in consideration of the covenants and agreements of the

parties of the second part herein contained, hereby agrees to sell to said second parties, an undivided one-half interest in (describing property).

"The purchase price . . . to be the full sum of . . . $15,000.00, payable as follows: . . ."

We summarize: (1) $50 per month beginning May 6, 1937; (2) right of immediate possession in second parties to work and remove ores with 10% royalty; entire purchase price to be paid within two years; "royalties and $50 per month" to be applied upon the purchase price; (3) "Any machinery placed upon the property" by second parties "in the event this contract is not completed by full payment, shall be and belong to the parties of the second part." The usual provisions appear, requiring second parties to perform assessment work, to begin operations within "thirty days from May 6, 1937." All work to be done properly, etc. "(d) This being a contract of sale in which possession is given, second parties agree that they will keep posted until the purchase price is paid, or the rights herein granted are forfeited to first party" notices of nonliability. The contract concludes with the following paragraph:

"it is further mutually agreed by and between the parties hereto that in the event the parties of the second part do not promptly pay the Fifty Dollars ($50.00) per month, or keep and perform the covenants and agreements required of them to be kept and performed, then all rights granted by this instrument shall cease and determine, and thereupon the contract shall become null and void."

On November 15, 1937, Russell and Harrison, as first parties, entered into an agreement with one O. H. Anderson, as second party, under which they agreed "to sell to second party" the Little Daisy claims and an adjoining strip to be located immediately by them, for $50,000, to be paid "on the following terms and conditions" which, for brevity, we summarize:

(1) Work to begin within ten days to sink shaft an additional 100 feet, or to drift if ore does not continue in shaft; (2) At least 120 man days' work per month. If second party fails "to perform the work for a period of sixty (60) days without just cause . . . it will be considered abandonment of the property." (3) Second party is given possession of the claims, and the usual right to mine and remove ores, with provision that he shall pay a graduated royalty of 10 to 25 per cent which shall be applied on the purchase price until paid in full. In section 4 the following appears:

"It is mutually agreed and understood between the parties hereto, that parties of the first part have contracted to purchase a one-half interest in the claims herein set out from T. L. Daniel. Said contract of purchase being dated the 20th day of April, 1937. . . . The terms and conditions set out in said contract between the parties of the first part and T. L. Daniel, and the subsequent Agreement thereafter entered into for extension of time to make the payments mentioned in the said contract entered into on the 20th day of April, 1937, are all taken into consideration between the parties to this agreement. Party of the second part may take over and perform at his option, the terms and conditions of said contract . . . , and is to receive credit on the purchase price of the said above claims on all monies paid to T. L. Daniel."

In section 5 it is provided that all machinery, equipment and improvements located on the claims shall remain during the first four months of operation by second party, and to be used by him. On or before March 25, 1938, second party is to pay first parties $2,000 for the machinery, equipment and improvements, including first parties' milling plant, "provided that party of the second part exercises his option to take over said claims on or before the 25th day of March, 1938."

Section 6 is quoted in full: "This being an option to purchase said claims on the terms above set out, second

party agrees that he will post and keep posted on said premises Notices of Non Liability, showing that he is working and operating said premises under an option contract, to purchase said claims on the 25th day of March, 1938, or any time before said date, from first parties, as provided by the Laws of the State of Arizona, for the purpose of protecting the parties of the first part against labor, material, man's lien.''

Sections 7 to 10, inclusive, set out the usual conditions to the effect that the work shall be done in a good and minerlike manner, conforming to state laws, timbering where necessary, etc. Provision is made requiring the second party in each year, on or before July first, to do annual assessment work. First parties have the right of inspection, and shall be furnished with duplicate smelter or mint returns for all ores shipped.

By section 11, second party assumes all liability for injuries or hazard to employees, etc., and concludes with these provisions: ''provided, the option to purchase said premises is exercised on or before the 25th day of March, 1938; in other words, until the full purchase price of said claims has been received by parties of the first part, or their order, or representatives.''

Section 12 specifically provides ''in case the option is exercised by party of the second part to purchase said claims, . . . in addition to royalties paid, there is to be paid to'' first parties $50 a month for fourteen months beginning March 25, 1938, and thereafter $100 per month for a period of two years, to apply on the purchase price. ''Party of the second part shall have the right to remove any machinery placed by him or owned by him, from said claims within sixty (60) days from the termination of this instrument.''

Section 13. ''It is mutually understood and agreed between the parties hereto that the agreement above set out, is an option for four (4) months, ending the 25th day of March, 1938. If, at the end of the said four (4)

months' period, party of the second part desires to proceed with the development work, take over the mine; he shall give parties of the first part written notice of his intention; otherwise, this option will be considered forfeited on March 25th, 1938. Upon written notice of second party's intention to proceed with the further development of the mine, the above contract becomes the sole and only contract between the parties hereto and cannot be changed except by written consent of all the parties.''

Section 14 provides: ''Time is of the essence of this agreement.'' If the second party shall pay the purchase price and perform as required he shall have the right to receive a conveyance of the property. If he fails to make payments as required or perform conditions, the right to purchase and to receive conveyance and to have possession of and work the mine ''shall at once cease and determine.'' In such event he shall yield possession without notice. Any and all sums of money paid by him ''shall be and become the property of the said parties of the first part, as liquidated damages and as rent for said premises.''

Section 15: ''All machinery and equipment placed on said premises, or owned by party of the second part, shall be removed by party of the second part at his option, on termination of this agreement.

''It is agreed and understood that upon the termination of this agreement in any manner except by the purchase of said premises and their conveyance, that all timbering, ladders, pipe lines, gravity water development and buildings, and other permanent improvements shall remain on said property and be and become the property of the parties of the first part as liquidated damages.''

Contemporaneously with the foregoing agreement, the Daniel contract with his co-defendants was modified. This agreement is also dated November 15, 1937. It acknowledges that the $50 monthly payments have

been paid in full up to March 25, 1938. It provides for an extension for a period of two years from May 25, 1939, on condition that from that date $100 per month shall be paid for twenty-four months, with graduated royalties from 5 to $12\frac{1}{2}$ per cent. All payments and royalties "to be applied on the purchase price on the undivided one-half interest bought from the party of the first part, until the full purchase price shall have been paid." In all other respects the contract of April 20, 1937, "shall remain and be in full force and effect."

Anderson, with an associate Larry Burton, took possession of the claims and began operations. Larry Burton purchased Anderson's interest between March 25th and July, 1938. In that month, about the 18th, the plaintiff corporation was organized with Larry Burton and the defendants Russell and Harrison named as three of the five directors. Burton was president and Russell vice president. Larry Burton transferred all his rights to the plaintiff on July 18, 1938. It agreed to assume and carry out the terms of the agreement with defendants Russell and Harrison. On the 29th of July, 1938, Russell, as first party, entered into an agreement with the plaintiff as second party. The following recitations appear in this instrument:

"It is mutually agreed that there has heretofore been an agreement entered into for the sale and purchase of certain mining claims located in what is known as the Sunflower Mining District, Maricopa County, Arizona, by and between Tom Russell, Grady Harrison, and T. L. Daniels, parties of the first part, and O. H. Anderson, as party of the second part, the names of the mining claims being as follows: Little Daisy No. 1, No. 2, No. 3, and Little Daisy No. 4 Fraction.

"That said contract has heretofore been assigned by O. H. Anderson to Larry Burton, and said Larry Burton is to transfer all of his right, title and interest in and to the said contract to the Golden Rule Mining Company; . . . Tom Russell, one of the first parties to said agreement, has located what is known as 'Wil-

low No. 1, Lode Mining Claim' . . . in his, Tom Russell's name.

"That a mill is now being erected on said claim and certain machinery is being placed thereon for the purpose of milling ore from the said Little Daisy mining claim and/or other claims; . . . in case the contract heretofore entered into by and between Tom Russell, Grady Harrison and T. L. Daniels, parties of the first part, and O. H. Anderson, party of the second part, is carried out to completion and performed in accordance with the said agreement, Tom Russell, first party herein, agrees on his part to convey the said Willow No. 1 Lode Mining Claim to the Golden Rule Mining Company or its assigns, without any further cost or consideration other than the original contract, being performed in full accordance with the terms of said contract herein mentioned.

"That in case the said original agreement is forfeited, the Golden Rule Mining Company, or its assigns, may, at any time within ninety (90) days from the forfeiture of said original agreement, remove any and all machinery placed on said Willow No. 1, Lode Mining Claim, including belts used to run the said machinery.

"It is further understood and agreed that any buildings or other improvements placed on said mining claim is to be the property of the first party herein or his assigns."

After the organization of plaintiff, A. M. Burton, father of Larry, advanced considerable sums of money to it, aggregating $100,000, and became the majority stockholder. Work was carried on until June, 1941. Larry Burton was in charge of the corporate affairs, with defendant Russell as mine foreman. On February 18, 1941, Larry Burton resigned as president. Defendant Russell as vice president was left in charge of the property by its principal stockholder, A. M. Burton. Compliance was made with the terms of the Anderson contract. Apparently Anderson, Burton and the corporate plaintiff made all payments on the Daniel contract with his co-defendants, to May, 1941. Mr.

A. M. Burton refused to continue with advances. Employees were paid off by defendant Russell and operation stopped on June 19, 1941. Nothing further was done to comply with the contract under which the plaintiff was in possession and developing the property.

At the time of closing work, the shaft had been sunk several hundred feet. Tunnels and crosscuts had been run and a large amount of ore developed. A mill had been erected to treat the ore. Pumps had been installed and the whole plant integrated as a single operation. About the 26th of July, Larry Burton demanded that Russell allow him to remove the machinery, under authority from his father (the principal stockholder), appearing in a letter from which we quote:

"Dear Larry: I had expected the creditors of the Golden Rule Mining Company to throw it into the hands of the receiver and get their money out of the equipment. . . . it would be satisfactory with me for you to move what machinery you need over to the tungsten mine. This letter, as the majority stockholder, will be your authority to do so."

Attorneys for the plaintiff made efforts to secure possession of the machinery and equipment. All efforts failing to secure possession peaceably, action was instituted by plaintiff on December 12, 1941. The plaintiff claimed title and right to possession of the machinery and equipment which it had placed upon the Little Daisy group and the Willow No. 1 claims. The allegations were that defendants Russell and Harrison refused to deliver possession of the machinery. Defendant Daniel was made a party in order that he might assert any right which he had in the mining machinery and equipment. The prayer was for judgment against defendants Russell and Harrison for possession of the machinery and equipment, or for the sum of $15,000, the value thereof, plus reasonable rental value.

Defendants Russell and Harrison answered, setting up the various contracts referred to, asserting that

plaintiff abandoned the property in June, 1941; that defendants took possession of the property in September of that year, together with the machinery and equipment claimed by plaintiff, which it was alleged were part of the permanent improvements, and that removal would make the working of the mine impossible without replacement. They alleged that Larry Burton was without authority to make demand for possession for the corporation. The claim was made that the Anderson contract constituted an agreement of purchase and sale; that both it and the contract covering the Willow No. 1 claim had been forfeited and terminated; that time for removal of machinery and equipment, as fixed in the contracts, had elapsed, and that the machinery and equipment have become the property of defendants. Defendant Daniel answered separately. He alleged that the contract given by him to Russell and Harrison, assumed by plaintiff, was one of purchase and sale, and that upon its forfeiture and termination he became vested with the right to the machinery as permanent improvements. He prayed for a judgment against plaintiff for the balance of the purchase price. The trial court entered judgment, decreeing that Daniel had no right, title or interest in the machinery or equipment, and was not entitled to the balance of the purchase price, and against Harrison and Russell for the recovery of the machinery, or its value, in case delivery could not be had.

The issues as presented by defendants' assignments and propositions on this appeal are substantially as follows:

1. The Daniel contract was one of purchase and sale. Plaintiff assumed this contract and agreed to pay him as provided in the agreement, in the event it exercised its option under the Anderson contract to purchase said claims. He is, therefore, entitled to judgment from

the plaintiff for the balance due on the purchase price of his undivided one-half interest.

2. Upon the exercise of the option mentioned in the Anderson contract, it became a contract of purchase and sale, and the relationship of vendor and vendee was established between defendants Russell and Harrison as sellers, and the plaintiff as purchaser. All the mining machinery and equipment placed on the property by the vendee-plaintiff became a part of the realty and could not be removed from the property.

3. The contracts between plaintiff and defendants Russell and Harrison did not authorize the removal of permanent improvements made to the mining claims. Even if such property was removable under the terms of the contracts, no action was taken for the removal of the equipment until after the periods fixed in the agreements as the time for removal had expired.

The issues so made compel us first to determine the character of the contracts. Were they mere options, or development contracts, or contracts to sell, or contracts of purchase and sale? The contracts to say the least were not skillfully drawn. Their provisions would seem to be conflicting. In construing the contracts, however, we must take into consideration that they deal with mining property. Ordinarily the same rules apply to the construction of mine contracts as to usual land contracts. In applying these rules, however, the peculiar character of mining property, in that its value depends on its production, must be considered. Lindley, in his valued work on Mines, vol. 3, 3d Ed., Sec. 859, points this out in a very admirable and concise way:

"There is no class of contracts connected with the mining industry more familiar to the profession than that of options to purchase, working bonds, or executory contracts of sale. Unlike other classes of real estate, the value of a mine cannot be determined by mere superficial observation. Expensive investigations,

involving measurements, examination of underground geological conditions, and sampling invariably precede the consummation of a purchase or sale of mining property. . . . These conditions have given rise to a class of contracts infinite in variety, from a mere letter signed by the owner, agreeing to accept a certain price for his mine if paid within a certain time, to a formidable working bond, which contemplates entry into possession and extensive exploitation to prove the value of the mine before the privilege of purchase must be exercised. The ultimate object of all of them, however, is to secure the exclusive privilege of purchasing at a given price, within a specified time. . . . ''

In our effort to determine the character of the contracts involved in this litigation, we have examined many opinions. The cases are in hopeless conflict. The controlling factor in the interpretation of these contracts, as well as all other contracts, depends upon the purpose and intent of the parties as expressed therein. The courts are not at liberty to make new contracts for parties. *Ernest* v. *Deister,* 42 Ariz. 379, 26 Pac. (2d) 648; *Clarno* v. *Grayson,* 30 Or. 111, 46 Pac. 426.

''It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, . . .'' 17 C. J. S., Contracts, p. 702, § 296.

In the final analysis their construction must depend on the application of common sense, taking into consideration the purpose and objects of the parties and the results which they anticipated when they entered into the agreements. We take all these factors into consideration in determining the character of the contracts involved in this litigation.

It is our view that the contract for the Daniel one-half interest which he agreed to sell to his co-owners Russell and Harrison, cannot be construed as a contract of sale. It is only where the purchaser is

bound to pay the purchase price that an agreement can be construed as a contract of sale. *Treadway* v. *Western Cotton Oil, etc., Co.,* 40 Ariz. 125, 10 Pac. (2d) 371; *Suburban Imp. Co.* v. *Scott Lbr. Co.,* 4 Cir., 59 Fed. (2d) 711, 87 A. L. R. 555; *Berry* v. *Humphreys,* 76 W. Va. 668, 86 S. E. 568; *Gutierrez del Arroyo* v. *Graham,* 227 U. S. 181, 33 Sup. Ct. 248, 57 L. Ed. 472; *Williams* v. *Board of Com'rs,* 84 Kan. 508, 114 Pac. 858, 34 L. R. A., N. S., 1221; 66 C. J. 479; § 5. In its inception the Daniel contract is merely an agreement by the first party to sell and convey his interest within a specified time, if the payments and full consideration as mentioned therein are made within that time. It is a mere option or a contract to sell. The second parties do not bind themselves in all events to make the payment. Such payments must be made from time to time to keep the option agreement operative. They are required to perform work and to pay royalties from the proceeds of ore mined and removed from the premises. The instrument is referred to as a contract of sale, but in reality it is only an option of sale, or a contract to sell. The second parties may stop work or payments at any time and do not become liable for the balance of the purchase price. To hold otherwise would be to read something into the contract that is not there. If it does not bind the second parties to pay the purchase price it is an option. *United Farmers' City Mkt., Inc.,* v. *Donofrio,* 43 Ariz. 35, 41, 29 Pac. (2d) 144; *Harper* v. *Independence Dev. Co.,* 13 Ariz. 176, 108 Pac. 701; *Suburban Imp. Co.* v. *Scott Lbr. Co., supra; Colyer* v. *Lahontan Mines Co.,* 54 Nev. 353; 17 Pac. (2d) 697; Vol. 30, Words and Phrases, Perm. Ed., Option, p. 5, *et seq.;* 66 C. J. 485, sec. 12.

■■ The claim is made by defendants, however, that this contract was not only assumed by the plaintiff, but that the plaintiff agreed to pay the purchase price, thus converting it into a contract of sale. There can be no question that a contract of this character

might be so converted into a contract of sale. There is no written assumption on the part of the plaintiff agreeing to become liable for the balance of the purchase price. In the Anderson contract the Daniel agreement is referred to, but the following language appears:

"Party of the second part may take over and perform at his option, the terms and conditions of said contract, . . . and is to receive credit on the purchase price of the said above claims on all monies paid to T. L. Daniel."

It is urged that the testimony introduced discloses that the plaintiff agreed to pay the balance due on the Daniel contract, thus converting it into an agreement of sale. An examination of the testimony discloses that the evidence is conflicting as to this. The trial court heard all this testimony and found against the defendants' contention. We are bound by that finding and must of necessity conclude that the evidence did not transform the Daniel contract from an agreement to sell into an agreement of sale and purchase. *Mead* v. *Hummel*, 58 Ariz. 462, 121 Pac. (2d) 423; *Morgan* v. *Krook*, 36 Ariz. 133, 283 Pac. 287; *Hiatt* v. *Lee*, 48 Ariz. 320, 61 Pac. (2d) 401, 107 A. L. R. 444; *Kenton* v. *Wood*, 56 Ariz. 325, 107 Pac. (2d) 380.

■ Defendants urge that the parties interpreted the Daniel contract as one of sale and purchase. It is referred to as a contract of sale in the Anderson agreement, in the extension agreement of November 15, 1937, between Daniel and his codefendants. The same argument is advanced in connection with the Anderson contract. It is referred to as a sale and purchase agreement in the July 29, 1938, contract covering mill and Willow No. 1 claim and in the transfer of the Anderson contract by Larry Burton to the plaintiff. The character of contracts must be determined by their provisions rather than their labels. *Intermountain B. & L.*

*Ass'n* v. *Gallegos,* 9 Cir., 78 Fed. (2d) 972; 17 C. J. S., Contracts, p. 687, § 294, wherein it is said:

"Substance rather than form ordinarily controls the construction or interpretation of contracts. So the form or name which the parties give to an instrument will not control its interpretation nor determine its nature; the effect which the law gives to the terms of the contract or to the acts of the parties is in general determinative. In determining the real character of the transaction, the court looks to the intention of the parties duly ascertained, and to the purpose which is to be attained."

 Much of what has already been said applies to the Anderson contract. It seems obvious to us that the Anderson contract was substantially a development agreement, under and whereby the second party (ultimately the plaintiff) had the right by making and applying certain payments, to acquire title to the property. The second party in that contract was not bound in all events to pay the purchase price. If this agreement were to be read literally, defendants' position that the Anderson contract merely constituted an option for a period of four months and that thereafter it became a contract of sale, would be sustainable. If the only purpose of the agreement was the acquisition of title, defendants' position, under the decisions of this court in United Farmers' City Mkt. Inc., v. Donofrio, *supra; Onekama Realty Co.* v. *Carothers,* 59 Ariz. 416, 129 Pac. (2d) 918; and *Whalley* v. *George,* 52 Ariz. 267, 80 Pac. (2d) 449, would have to be upheld. It is apparent, however, that the main purpose of this agreement was for the development of the property, with the purchase incidental. The option feature, that is, the right to the purchase, did not cease as of March 25, 1938, but continued. Indeed, by section 11 of the agreement, it is so specifically provided. There it is said:

"provided, the option to purchase said premises is exercised on or before the 25th day of March, 1938; in other words, until the full purchase price of said claims has been received by the parties of the first part, . . . ."

Again, in section 13, where reference is made to the effect that the option is for four months, the following appears:

"If, at the end of the said four (4) months' period, party of the second part desires to proceed with the development work, take over the mine; he shall give parties of the first part written notice of his intention; . . . . Upon written notice of second party's intention to proceed with the further development of the mine, the above contract becomes the sole and only contract between the parties hereto and cannot be changed except by written consent of all the parties."

We conclude that neither the Daniel nor the Anderson contracts at any time were more than contracts to sell, or options. Consequently the strict relationship of vendor and vendee did not exist between the parties, nor is the plaintiff liable for the balance due on the purchase price under either contract. *McMillan* v. *Lorimer*, 160 La. 400, 107 So. 239; Harper v. Independence Dev. Co., *supra; Houghton* v. *Mammoth Ariz. G. M. Co.*, 50 Ariz. 44, 68 Pac. (2d) 957; *Snider* v. *Yarbrough*, 43 Mont. 203, 115 Pac. 411; *Johnson* v. *Clark*, 174 Cal. 582, 163 Pac. 1004; *Kenton Coal & Oil Co.* v. *Petroleum Exploration*, 287 Ky. 563, 154 S. W. (2d) 556.

 Our conclusion here is not in conflict with the decisions of this court in the Donofrio, Onekama and Whalley cases, *supra.* In the first case the contract, though optional in form, was obviously intended as a contract of sale and purchase. It was pointed out in the opinion that the purpose of the deal was to enable the second party, purchaser or optionee, to build on the land covered by the contract and that a $100,000 structure had been erected upon the ground, in addi-

tion to payments made. The facts in the second case justify the conclusion that was there reached by the court. The optionee had two years within which to pay the consideration. To keep the option good, interest on the purchase price was payable quarterly in advance. The option was not exercised within the time provided. Several years after the expiration date, the seller accepted one-half of the purchase price. The court held that the transaction thereupon became a contract of purchase and sale. Since the option no longer existed and the evident and only purpose was to sell and purchase, the transaction was properly classed as a sale and purchase. In the Whalley case the court held that the original option was transmuted into a contract of purchase and sale by the execution of a subsequent escrow agreement at the time of the first payment under the option. These decisions were not intended to, and do not, lay down as a rule that the mere payment by the optionee of a portion of the purchase price transforms the option into one of sale and purchase. It is a question of fact, depending upon the surrounding circumstances and the intention of the parties.

Defendants have cited numerous decisions to the effect that in the absence of an agreement to the contrary machinery placed upon the ground, and necessary for its working, becomes a fixture. We think it unnecessary to consider these cases since the contracts involved here make specific provisions, with respect to machinery and equipment. For instance, the Daniel contract provides that if the agreement is not completed by full payment, any machinery placed upon the property shall belong to the parties of the second part. No time is fixed for the removal of such machinery and equipment. In fact, nothing is said about its removal, but since by the terms of the agreement it remains the property of the second parties, there is necessarily implied a right of removal. The rule is

o

that one having the right of removal of a fixture has a reasonable time within which to exercise such right. A delay in exercising such right, unless unreasonable, is not an abandonment of the right to remove. *Pennington* v. *Black*, 261 Ky. 728, 88 S. W. (2d) 969; *Holtgreve* v. *Sobolewski*, 326 Mo. 412, 31 S. W. (2d) 993; *M. H. B. Co.* v. *Desmond*, 151 Wash. 344, 275 Pac. 733; *Kennedy* v. *City of Hood River*, 122 Or. 531, 259 Pac. 911; *Clark* v. *Clark* (Tex. Civ. App.), 107 S. W. (2d) 421; 36 C. J. S., Fixtures, p. 960, § 22.

The Anderson contract provides specifically that all machinery and equipment placed on the premises, and owned by the second party, may be removed within sixty days after termination of the contract. The Russell agreement with plaintiff, covering the mill and Willow No. 1 claim, allows ninety days on forfeiture of the Anderson agreement for the removal of all machinery placed by plaintiff on said claim. In the Anderson agreement the following specific provisions appear:

"All machinery and equipment placed on said premises, or owned by the party of the second part shall be removed by party of the second part at his option, on termination of this agreement. . . .

" . . . all timbering, ladders, pipe lines, gravity water development and buildings, and other permanent improvements shall remain on said property and be and become the property of the parties of the first part as liquidated damages."

Defendants take the position that the term "permanent improvements," appearing in the Anderson contract, includes such machinery and equipment as was affixed to the real property, and that therefore the plaintiff has no right of removal as to such fixtures. We cannot agree with this view. The agreements of the parties in all the contracts indicate clearly that all machinery and equipment owned by plaintiff was to remain its property and the plaintiff had the right to

remove upon termination. The kind of property which can be removed and the character of property which is to remain are specifically listed in the agreement. Under the *ejusdem generis* rule repeatedly applied by this court, the general term "other improvements" cannot be held to include machinery and equipment, but only that character of property listed before the use of the term, such as "timbering, ladders, pipe lines, gravity water development and buildings." *White* v. *Moore,* 46 Ariz. 48, 46 Pac. (2d) 1077; 28 C. J. S., *Ejusdem,* p. 1049.

The Anderson contract was recorded. The defendant Daniel had both actual and constructive notice of its terms. Where there is a right of removal reserved in an agreement between the parties, third parties who have actual or constructive notice are bound by its terms. *Oroville-Wyandotte Irr. Dist.* v. *Ford,* 47 Cal. App. (2d) 531, 118 Pac. (2d) 340; *Mattechek* v. *Pugh,* 153 Or. 1, 55 Pac. (2d) 730; *King* v. *Blickfeldt,* 111 Wash. 508, 191 Pac. 748. There can, of course, be no question that where a contract provides that fixtures may be removed, the right of removal can be exercised. *Warner* v. *Intlehouse,* 60 N. D. 542, 235 N. W. 638; *McClintock & Irvine Co.* v. *Ætna Explosives Co.,* 260 Pa. 191, 103 Atl. 622, Ann. Cas. 1918E, 1078; *Standard Oil Co.* v. *Barlow,* 141 La. 52, 74 So. 627. It is urged here, however, that so far as the Anderson and Russell contracts are concerned, the machinery was not removed within the respective sixty and ninety day period, as provided in these contracts. It is said that time is of the essence, and since the removal was not made within the period provided, the plaintiff lost its right to remove. The plaintiff's position is that it made demand for removal through Larry Burton on July 25, 1941, within the time limits mentioned in the contracts, and that the defendants, acting through Russell, prevented the removal of the equipment. It seems to be well settled that where removal is prevented by

the landlord, the time for removal is extended until removal becomes possible. *Podlech* v. *Phelan,* 13 Utah 333, 44 Pac. 838; 26 C. J. 709, § 100; 36 C. J. S., Fixtures, § 41.

 This brings us to the final phase of the case. May Larry Burton be considered under the circumstances as an agent for the corporation so as to constitute his demand a corporate act? If he was not such corporate agent, may the defendants take advantage of the act of defendant Russell, who was vice president of the corporation, in preventing the removal of the machinery and equipment? We think that under the facts in this case Larry Burton may be considered at least as the *de facto* agent of the corporation. While he had resigned as president, he was still a director of the corporation. He was acting through authorization of the majority stockholder. The board of directors seems not to have been available. The only officer of the corporation who was acting as such was the defendant Russell whose interests were adverse to that of the corporation. A stockholder may maintain a suit on behalf of the corporation. Such suit may be instituted without a previous demand if it appears that such a demand on the corporation would be useless or unavailing. A demand may also be excused where there were no legal officers or directors, or where it would entail an injurious delay. 18 C. J. S., Corporations, p. 1283 *et seq.,* § 564, subsec. c; 13 Fletcher's Cyc. Corp., Perm. Ed., 169, par. 5832. If an action may be so filed for the corporation, it is obvious that as a preliminary to such an action and for the protection of the corporate property, a stockholder would have the right to make a demand. Furthermore, while the old rule was otherwise, it is now held that "the trend of authority is to uphold as binding on the corporation acts or contracts on its behalf by a person or persons owning all or practically all the stock, even though there is a lack of, or defect in, some corporate step, or action." 19 C. J. S.,

Corporations, p. 472, § 1004. Under the circumstances it would appear that Larry Burton was at least an agent or director *de facto,* and that therefore as to third parties (the defendants) his authority in representing the corporation in making the demand for its property cannot be questioned. The rule is as between third persons and a corporation, the acts of a *de facto* officer, director or agent, if otherwise legal, are valid and binding. 19 C. J. S., Corporations, p. 76 *et seq.,* §§ 739, 740.

■ In any event the defendants are not in a position to maintain that the corporation failed to remove the property involved within the periods fixed in the contracts. The evidence discloses that two of the defendants, Russell and Harrison, were directors of the corporation. Russell was also the vice president and general manager, solely in charge of machinery and assets which belonged to the corporation at the time it shut down. He did not resign. He continued in possession up until the institution of the action on the part of the plaintiff. His possession may be deemed that of the corporation. He is estopped to deny its title or possession, nor may he make any personal profit from the corporation's property, or acquire title adverse to it by advantages acquired through his trusteeship. The estoppel also applies to his co-defendant Harrison. 3 Fletcher's Cyc. Corp., Perm. Ed., 168, par. 854; *Dragoon Marble & Min. Co.* v. *McNeish,* 28 Ariz. 96, 235 Pac. 401; *Buckhorn Plaster Co.* v. *Consolidated Plaster Co.,* 47 Colo. 516, 108 Pac. 27; *Lead Cliff Min. Co.* v. *Wickstrom,* 49 Idaho 573, 290 Pac. 390.

■ Plaintiff, in its reply to the affirmative answer of defendants, alleges the relationship of Russell to the corporation, and sets up that he was a trustee charged with both its management and in the holding of its assets. Although not alleged in terms as a plea of estoppel, it is in fact such a plea so that the issue

34

was properly presented to the trial court. *Munger* v. *Boardman,* 53 Ariz. 271, 88 Pac. (2d) 536.

We find no error in the record. The judgment is affirmed.

STANFORD, C. J., and LaPRADE, J., concurring.