492 P.2d 711

B. L. GUSTAFSON, General Contractor, Appellant,

v.

James M. SMITH and Winnie E. Smith, Appellees.

No. 1 CA–CIV 1474.

Court of Appeals of Arizona, Division 1, Department A.

Jan. 18, 1972.

Rehearing Denied Feb. 17, 1972.

Review Denied March 21, 1972.

Lewis & Roca by John P. Frank, Peter D. Baird, and Douglas R. Chandler, Phoenix, for appellant.

Hughes, Hughes & Conlan by John C. Hughes, Phoenix, for appellees.

STEVENS, Presiding Judge.

B. L. Gustafson, as plaintiff, filed an action in the Superior Court naming numerous defendants including James M. Smith and Winnie E. Smith, his wife. Mr. and Mrs. Smith are herein collectively referred to as Smith, it not appearing that Mrs. Smith was active in any of the matters affecting this cause, except that she affixed her signature to a deed and to a trust agreement.

Gustafson's complaint charged that the defendants, including Smith, were guilty of acts and conduct which he urges entitled him to recover his contract price from the defendants and further urges that his remedy was not limited to foreclosing the improvement liens.

In the Superior Court Smith filed a motion to dismiss under Rule 12(c), Rules of Civil Procedure, 16 A.R.S. The motion was treated as a motion for summary judgment pursuant to Rule 56. The trial court granted the Smith motion, entering a formal written order with a Rule 54(b) provision. This appeal followed.

After the appeal was lodged in this Court, there was a suggestion as to Mr. Smith's death which was followed by an order substituting his co-executors as parties. This Court has elected to retain the original caption.

Gustafson is a qualified and duly licensed contractor. He entered into a contract with Improvement District No. 126, Mohave County, Arizona, to install certain paving and water lines in a Mohave County subdivision known as Gateway Acres. The contract price was $300,000. The contract was performed and accepted by the improvement district. Improvement bonds were issued to Gustafson in payment of the contract. Various property owners within the improvement district refused to pay their assessments and urged misrepresentation as to the quality and cost of the improvements at the time their signatures were solicited leading up to the formation of the improvement district. They urge that the finished product was inferior to the improvements promised and that the cost of the improvements was approximately three times the prospective cost as represented to them at the time their signatures were solicited. Gustafson could not sell the bonds. There is no indication that Gustafson joined in or knew of any of the representations which led up to the formation of the improvement district. There is no indication that Gustafson did not fulfill his contract. There is no indication that there was any legal defect in the formation of the improvement district or that the statutes were not fully observed in the letting of the contract and the issuance of the bonds. See A.R.S. §§ 11–701 to 11–759.

In the matter now before us we are not called upon to determine the truth of the allegations as to the acts and representations of defendants, other than Smith, and nothing in this opinion shall be considered as a decision by this Court in relation to those issues. For the purposes of this opinion we assume that there were acts of wrongdoing by persons other than Smith leading up to the formation of the improvement district and our concern is whether the record discloses that these acts could be charged to Smith.

■ A summary judgment may not be granted unless there is no genuine issue as to any material fact. Rule 56(c). In relation to motions for summary judgment, Rule 56(e) provides in part that:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

The Smith motion for summary judgment was based upon documents, affidavits and depositions presented by both sides. While the complaint was verified, it was verified on information and belief by one of the attorneys for the plaintiff and the complaint does not show on its face that it meets the test of the above-quoted portion of Rule 56(e). Under these circumstances we do not consider the allegations of the complaint as being matters in opposition to the motion for summary judgment. Rule 56(e) further provides that:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

We set forth the factual background most favorable to Gustafson, the losing party on the motion for summary judgment. Hensley v. Town of Peoria, 14 Ariz.App. 581, 485 P.2d 570 (1971).

## BACKGROUND

Gateway Acres had been platted as a Mohave County subdivision with five-acre lots and dedicated streets some time prior to 1944. In 1944 or 1945 Smith bought the subdivision and other acreage in Mohave County for forty cents an acre. We assume that he derived his title through delinquent taxes. He and his sons put the

land to use as grazing land. He sank a well which was dependable and produced water for the livestock.

Some years later a corporation named the Arizona Newspapers, Inc., attempted to launch a daily newspaper in the Phoenix area and began publishing the Arizona Journal. The paper was not a financial success and Smith and another man became interested in attempting to save it. A new corporation, the Central Arizona Newspapers, Inc., was formed on 19 June 1963. The new corporation took over the paper and Smith was active in the management of the paper until 26 December 1963. In the meantime he had invested and lost some $600,000 in the venture, no part of which was recovered by him. On 15 January 1964 a stock sale prospectus for the Central Arizona Newspapers, Inc., was published, seeking further capital to save the Arizona Journal. Smith was still a corporate officer. One feature of the prospectus was the right to convert the Central Arizona Newspapers, Inc., stock into land at Gateway Acres at the face value of the investment in the stock. Before long the Arizona Journal ceased publication.

Smith caused an appraisal to be made of Gateway Acres with the result that the appraised value was $582 per acre. There were substantially no improvements on the land. On 20 May 1964 Smith and other members of his family entered into trust agreement number 4699 with the then Phoenix Title & Trust Company which is now the Transamerica Title Insurance Company as trustee. Smith and his family were the first beneficiaries and Fidelity Land Corporation was the second beneficiary. Gateway Acres was deeded to the title company as trustee. On Smith's request, that portion of the trust agreement which would authorize Smith to sue for the unpaid purchase price was deleted. As a result of this action, in the event of default by Fidelity Land, Smith's sole remedy was that of forfeiture. The original purchase price which was close to $1,000,000, was later reduced. The original purchase price figure was based upon the number of acres involved at the appraised figure of $582 per acre. We quote portions of Section III and Section V of the trust. Section III is part of the printed form and Section V is a typed insert.

### "SECTION III

"A. Second Beneficiary and persons claiming under Second Beneficiary shall have the right to possession of the above described property during the duration of Second Beneficiary's interest in this Trust.

"B. Second Beneficiary, when not in default hereunder, may cause said property or a part thereof to be subdivided and improved, provided any subdivision plat or plats thereof shall comply with all existing governmental rules and regulations. Trustee is further authorized by First Beneficiary to file for record such restrictions as Second Beneficiary may submit. All expenses in connection with subdividing and improving said property including but not limited to installing streets, water lines, sewers or any public utilities, shall be the obligation of Second Beneficiary."

### "SECTION V

\*    \*    \*    \*    \*    \*

"As further consideration, however, Second Beneficiary agrees to subdivide, improve or otherwise prepare said property for sale on not less than a one acre lot basis as Second Beneficiary's cost and to establish said subdivision in accordance with the terms of this Trust Agreement and the laws of the State of Arizona.

"As further consideration Second Beneficiary agrees to assume and carry out the commitments made by First Beneficiary, or any one of them to certain stockholders of Arizona Newspapers, Inc., and Central Arizona Newspapers, Inc., which commitments were made by First Beneficiary in their attempts to finance and publish the Arizona Journal Newspaper.

"It is agreed that First and Second Beneficiaries do not know how much land will be involved or used by First Beneficiary in satisfying the commitments made by First Beneficiary whereby the stockholders of Arizona Newspapers, Inc., and Central Arizona Newspapers, Inc., will acquire portions of the land being held hereunder, therefore, it is agreed that First Beneficiary will credit Second Beneficiary for liquidation of the purchase price set forth above at the rate of $582.00 per acre for all land used by Second Beneficiary in satisfying the commitments made by First Beneficiary to said stockholders of Central Arizona Newspapers, Inc., and shall be credited with the sum of $291.00 per acre for all land used to satisfy stockholders of Arizona Newspapers, Inc."

There was also a typed provision that the second beneficiary would pay not less than 75% of all sums received from the sale of land. Thus, if any land sold was sold for a sum in excess of $776 per acre, Smith would receive more than $582 for the release of that parcel of land and the excess would be applied to the toal purchase price.

As before stated, the stockholders of Central Arizona Newspapers, Inc., had the privilege of converting their stock for Gateway Acres land at the face value of the stock. The conversion privilege for the stockholders of Arizona Newspapers, Inc., was not at face value.

Some land was sold outright and some land was transferred pursuant to the conversion privilege. The exercise of the conversion privilege called for some additional monetary payment.

The record reflects that the creation of an improvement district was not discussed with or considered by Smith prior to the May 1964 trust agreement.

The obligations of Fidelity Land under the trust agreements were to replat the subdivision into one-acre lots, to lay out the dirt roads and to sell the land.

The officials of Fidelity Land believed that the value of the land and the possibility of the sales thereof would be increased if the roads were paved and water lines were installed. This prospect was discussed with Smith after the execution of the trust agreement. Smith advised against it. He was fearful that the result would be a failure, as it turned out to be. He was fearful that the people of meager means who owned the land in Gateway Acres would lose their land. Smith did not discuss the cost of the improvements and he made no representations with reference thereto. He secured no signatures for the creation of the improvement district and he gave no advice relative thereto. Smith did agree that if Fidelity Land drilled a dry well, then that portion of the water produced by the Smith family well which was not needed for livestock would be available for use in the subdivision. Smith admitted that if an improvement district was formed and was successful, the lands which he owned in Gateway Acres would increase in value. He hoped that Fidelity Land would succeed in its efforts to sell the land as he did not desire to have the land back, even though he deleted the power of suit to recover the unpaid purchase price in the event of default.

## WAS THE TRUST AGREEMENT A SALE OF LAND?

Gustafson urges that since Fidelity Land was not under a legally enforceable obligation to pay the full purchase price, the trust agreement was not a sale of land by Smith to Fidelity Land. We find the following statements in Russell v. Golden Rule Mining Company, 63 Ariz. 11, 159 P. 2d 776 (1945), at pages 24 and 25 of 63 Ariz. and page 782 of 159 P.2d:

"It is only where the purchaser is bound to pay the purchase price that an agreement can be construed as a contract of sale. * * * The instrument is referred to as a contract of sale, but in reality it is only an option of sale, or a contract to sell."

In our opinion, whether there was a sale is not determinative of this appeal.

## WAS THERE AN AGENCY WHICH BOUND SMITH?

The fact that Smith could not enforce the payment of the full purchase price did not constitute Fidelity Land as his agent. Smith in no way participated in any of the representations made to the Gateway Acres owners to induce them to sign petitions favoring the creation of the improvement district. He exercised no control over Fidelity Land and its operation of Gateway Acres. His only interest was a financial return from the sale of the land and the protection of those who exercised the stock conversion privilege.

## THE EFFECT OF THE IMPROVEMENT DISTRICT

The improvement district, its formation and its activities, are, so far as the record discloses, legal and unimpeached. The record does not support facts, which if proven, would have enabled Gustafson to go behind the improvement district and to establish a personal financial liability on the part of Smith.

Gustafson places great reliance upon the case of Massei v. Lettunich, 248 Cal.App. 2d 68, 56 Cal.Rptr. 232 (1967). We have no difficulty in distinguishing Massei from the case at bar. In Massei there was no trust agreement. In Massei the owner of the land was an active participant in the factual background which resulted in the losses sustained by those who had purchased the land.

There are other legal theories which have been urged by Gustafson and which we have not answered for the reason that we are unable to find facts, disputed or otherwise, which would create a triable issue in relation to Smith. We conclude that there was no error in the granting of the Smith motion for summary judgment or in the entry of the judgment thereon.

Affirmed.

·CASE and DONOFRIO, JJ., concur.