548 P.2d 1166

**Charles R. BROOKS, Appellant,**

v.

**The VALLEY NATIONAL BANK, a corporation, Appellee.**

**No. 12334–PR.**

Supreme Court of Arizona, In Banc.

April 26, 1976.

Yankee & Bernstein by James A. Yankee, Phoenix, for appellant.

Snell & Wilmer by George H. Lyons and John J. Bouma, Phoenix, for appellee.

HOLOHAN, Justice.

Appellant Brooks filed an action for himself and on behalf of all mortgage borrowers of appellee, Valley National Bank for a declaratory judgment and an accounting of that portion of mortgage payments paid for taxes and insurance. The action also sought compensatory and punitive damages from the appellee. The superior court granted the motion of appellee to dismiss the action. On appeal, Division One of the Court of Appeals affirmed. *Brooks v. Valley National Bank*, 24 Ariz. App. 484, 539 P.2d 958 (1975). Appellant's petition for review was accepted by this Court. The opinion of the Court of Appeals is vacated. The judgment of the superior court is affirmed.

In May, 1968, appellant Charles R. Brooks and his wife purchased a residence and assumed an outstanding mortgage which had been contracted with appellee Valley National Bank by appellant's predecessor in interest. Under the terms of the mortgage, appellant was required to pay to the appellee, in addition to monthly payments of principal and interest, a monthly prorated amount to secure the payment of taxes, insurance premiums, and special assessments on the mortgaged premises. The appellee assigned the mortgage to the Dollar Savings Bank of New York, which designated appellee as the servicing agent of the mortgage.

The action by the appellant challenged the practice of the appellee bank in its use of the monthly amounts collected from mortgagors for payment of taxes and insurance—the so-called impoundments. The appellant argued that the amounts collected by the bank were being used by it in its banking business, and the impoundment funds were not actually set aside for the use required under the mortgage.

As formulated by the appellant, the essence of his claim for relief rests on two stated grounds:

"[1]  *Relief Grounded on Contract*

Defendant has breached its fiduciary duties as trustee in the funds in that it has affirmatively used the impound account for its own benefit and not the benefit of the individual beneficiaries.

"[2]  *Equitable Relief*

Defendant has become 'unjustly enriched' to the extent that it has benefitted from the use of said impound funds."

The issue of whether appellant has properly asserted a class action is not before us; the question for review is whether the appellant is entitled to relief under either of his theories.

The controversy concerning the use of impoundment funds by banks and savings and loan associations has been the subject of litigation in a number of jurisdictions: *Manchester Gardens, Inc. v. Great West Life Assurance Co.,* 205 F.2d 872 (D.C. Cir. 1953); *Surrey Strathmore Corp. v. Dollar Savings Bank of New York,* 36 N.Y.2d 173, 366 N.Y.S.2d 107, 325 N.E.2d 527 (1975); *Buchanan v. Brentwood Federal Savings and Loan Association,* 320 A.2d 117 (Pa.1974); *Carpenter v. Suffolk Franklin Savings Bank,* 291 N.E.2d 609 (Mass.1973); *Tucker v. Pulaski Federal Savings & Loan Association,* 481 S.W.2d 725 (Ark.1972); *Abrams v. Crocker-Citizens National Bank,* 41 Cal.App.3d 55, 114 Cal.Rptr. 913 (1974); *Durkee v. Franklin Savings Association,* 17 Ill.App.3d 978, 309 N.E.2d 118 (1974); *Yudkin v. Avery Federal Savings and Loan Association,* 507 S.W.2d 689 (Ky.App.1974); *Zelickman v. Bell Federal Savings and Loan Association,* 13 Ill.App.3d 578, 301 N.E.2d 47 (1973); *Sears v. First Federal Savings and Loan Association of Chicago,* 1 Ill. App.3d 621, 275 N.E.2d 300 (1971). The decisions in the Illinois cases are based on mortgage instruments with somewhat different provisions than those found in the mortgage in this case, but the other cases involve mortgage provisions substantially the same as the one in issue. Common to most of the above cases is the attempt by the mortgagor to impose a trust on the impoundment funds. The mortgage provision upon which appellant relies provides:

"And the Mortgagor, in order more fully to protect the security of this mortgage, covenants and agrees as follows:

"1.  That he will pay the indebtedness, as hereinbefore provided.

·  ·  ·  ·  ·  ·

"2.  That, together with, and in addition to, the monthly payments of principal and interest payable under the terms of the note secured hereby, the Mortgagor will pay to the Mortgagee, on the first day of each month until the said note is fully paid, the following sums:

"(a)  If this mortgage and the said note secured hereby are insured under the provisions of the National Housing Act and so long as they continue to be so insured, one-twelfth ($\frac{1}{12}$) of the annual mortgage insurance premium for the purpose of putting the Mortgagee in funds with which to discharge the said Mortgagee's obligation to the Federal Housing Commissioner for mortgage insurance premiums pursuant to the applicable provisions of the National Housing Act and Regulations thereunder.  The Mortgagee shall, on the termination of its obligation to pay mortgage insurance premiums, credit to the account of the Mortgagor all payments made under the provisions of this subsection which the Mortgagee has not become obligated to pay to the Federal Housing Commissioner.

"(b)  A sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire

and other hazard insurance covering the mortgaged property, plus taxes and assessments next due on the mortgaged property (all as estimated by the Mortgagee) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, taxes, and special assessments.

"(c) All payments mentioned in the two preceding subsections of this paragraph and all payments to be made under the note secured hereby shall be added together and the aggregate amount thereof shall be paid by the Mortgagor each month in a single payment to be applied by the Mortgagee to the following items in the order set forth:

(I) premium charges under the contract of insurance with the Federal Housing Commissioner;

(II) ground rents, taxes, special assessments, fire and other hazard insurance premiums;

(III) interest on the note secured hereby; and

(IV) amortization of the principal of said note.

Any deficiency in the amount of any such aggregate monthly payment shall, unless made good by the Mortgagor prior to the due date of the next such payment, constitute an event of default under this mortgage. The Mortgagee may collect a 'late charge' not to exceed two cents (2¢) for each dollar ($1) of each payment more than fifteen (15) days in arrears to cover the extra expense involved in handling delinquent payments.

"3. That if the total of the payments made by the Mortgagor under (b) of paragraph 2 preceding shall exceed the amount of payments actually made by the Mortgagee for ground rents, taxes or assessments or insurance premiums, as the case may be, such excess shall be credited by the Mortgagee on subsequent payments to be made by the Mortgagor. If, however, the monthly payments made by the Mortgagor under (b) of paragraph 2 preceding shall not be sufficient to pay ground rents, taxes and assessments, and insurance premiums, as the case may be, when the same shall become due and payable, then the Mortgagor shall pay to the Mortgagee any amount necessary to make up the deficiency, on or before the date when payment of such ground rents, taxes, assessments, or insurance premiums shall be due. If at any time the Mortgagor shall tender to the Mortgagee, in accordance with the provisions of the note secured hereby, full payment of the entire indebtedness represented thereby, the Mortgagee shall, in computing the amount of such indebtedness, credit to the account of the Mortgagor all payments made under the provisions of (a) of paragraph 2 hereof which the Mortgagee has not become obligated to pay to the Federal Housing Commissioner, and any balance remaining in the funds accumulated under the provisions of (b) of paragraph 2 hereof. If there shall be a default under any of the provisions of this mortgage resulting in a public sale of the premises covered hereby, the Mortgagee shall be, and hereby is, authorized and empowered to apply, at the time of the commencement of such proceedings, the balance then remaining in the funds accumulated under (b) of paragraph 2 preceding, as a credit against the amount of principal then remaining unpaid under said note and shall

properly adjust any payments which shall have been made under (a) of paragraph 2."

The appellant argues that the impoundment funds in paragraph 2(b) are to be held *in trust* to pay specific debts to third persons. He asserts that the bank has not held the funds in trust but uses them for their own purposes, and this use is an abuse of the trust for which the bank should respond in damages and account for any profits which it may have made on the use of the funds.

The two principal cases lending some support to appellant's position are: *Carpenter v. Suffolk Franklin Savings Bank, supra,* and *Buchanan v. Brentwood Federal Savings and Loan Association, supra.* In each of the foregoing trial courts dismissed complaints by plaintiffs which sought to impose a trust on impoundment funds. The decisions of the trial courts were reversed in each instance because the pleadings alleged sufficient facts, if proven, to establish a trust. In the *Carpenter* case the Massachusetts court did not have the written instrument before it, but the facts alleged were sufficient to require a trial of the issue. The written instruments were before the Pennsylvania Supreme Court in the *Buchanan* case, and that court concluded that the plaintiffs had alleged sufficient facts together with the instrument to afford them the opportunity to prove their claim that the funds were paid to the financial institution with the expressed purpose that the funds be used for the stated purpose only. Neither the Massachusetts court nor Pennsylvania court decided the ultimate issue whether the funds were in fact held in trust.

A slightly different pleading situation was presented in *Abrams v. Crocker-Citizens National Bank, supra.* The financial institution moved for summary judgment against the mortgagors who had alleged a trust. The bank supported its motion with an affidavit stating that it never intended to receive the funds as a trustee. The

mortgagors filed a counteraffidavit stating that they intended and expected the funds to be held in trust by the bank. In view of the factual dispute, the trial court's judgment on the motion for summary judgment was reversed. The California appellate court noted that the pleadings were sufficient to raise the issue of the creation of a trust, and the affidavits merely raised a fact question which must be resolved by trial. As that court pointed out:

"There is thus a factual conflict between appellants' declaration that they expected and intended the fund to be held in trust and respondent's declaration that it never intended to create a trust. Money does not necessarily constitute a trust fund because the parties characterize it as a 'trust'; the terms employed by the parties are only one of the factors to be considered. [citation omitted]" 41 Cal.App.3d at 60, 114 Cal.Rptr. at 915.

In this case the appellee's motion for judgment was supported by an affidavit that stated that the bank never intended to act as a trustee in the receipt or maintenance of the impoundment funds. Unlike the situation in *Abrams v. Crocker-Citizens National Bank, supra,* the appellant did not file an opposing affidavit stating that he intended that the funds be held in trust. There was no factual dispute presented. The trial court was required to consider the legal effect of the specific statements made by the affidavit filed upon behalf of the appellee.

To determine whether the payment of money creates a debt or a trust, comment g, Restatement 2d, Trusts § 12 states in part:

"*g. Manifestation of intention.* If one person pays money to another, it depends upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created. If the intention is that the person receiving the

money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created.

"The intention of the parties will be ascertained by a consideration of their words and conduct in the light of all the circumstances. Among the circumstances which may be of importance in determining the intention of the parties are: (1) the presence or absence of an agreement to pay interest on the money paid; (2) the amount of money paid; (3) the time which is to elapse before the payee is to be called upon to perform his agreement; (4) the relative financial situation of the parties; (5) the relations between the parties; (6) their respective callings; (7) the usage or custom in such or similar transactions.

. . . . "

■ Applying these principles to the case at issue it is clear that the bank never intended a trust relationship, and, as stated in appellee's affidavit, the custom of financial institutions in the area conducting similar transactions is that no trust relationship is intended. The fact that the words "in trust" are used does not alter the intent of the parties, and the appellant cannot rely on this phrase to impose a trust on the payment of funds which he does not claim he intended to be held in trust and which appellee specifically denies receiving in any trust relationship. The trial court was correct in finding that a trust was not created in the maintenance of the impoundment funds.

Appellant contends that, even if there is no trust relationship, nevertheless, the appellee is unjustly enriched by being able to use the impoundment funds. Appellant requests that he receive interest on the amount of his impoundment funds.

The appellee bank, in an affidavit, figured the amount of interest which appellant would have earned on the funds in his impoundment account if the prevailing savings account rate of interest were paid, and the total amount earned would have been $8.91 for 1969; $6.74 for 1970; and $6.68 for 1971. The appellee spends about $8.27 per year per account servicing the impoundment accounts which includes paying the taxes and insurance and accounting to the mortgagor by statement reflecting the amounts paid for taxes and insurance. Appellee maintains that there is no unjust enrichment.

■ The more fundamental consideration is whether appellant has stated a claim for unjust enrichment. The mortgage agreement attempts to set forth some rather detailed financial arrangements. Provision is made for the accumulation and disposition of the impoundment funds under various situations. As pointed out in *Manchester Gardens, Inc. v. Great West Life Assurance Co., supra,* the absence of a provision to pay interest on the impoundment funds is equivalent to an agreement that it should not be paid. A person is not entitled to compensation on the grounds of unjust enrichment if he receives from the other that which it was agreed between them the other should give in return. Restatement of Restitution § 107, comment (1)a. Finally, where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application. *Ashton Company, Inc., Contr. & Eng. v. State,* 9 Ariz. App. 564, 454 P.2d 1004 (1969).

Affirmed.

CAMERON, C. J., and HAYS and GORDON, JJ., concur.

STRUCKMEYER, Vice Chief Justice (specially concurring):

I concur with the court's decision that the judgment of the Superior Court should be affirmed. However, I cannot agree with the reasons expressed for affirmance, being of the opinion that a trust is created by the language of the mortgage.

Certain of the undisputed facts important to the resolution of this case will be set out first.

On May 2, 1958, Walter J. Gray and Alva M. Gray entered into a mortgage agreement with the Valley National Bank. Ten years later, on the 24th of May, 1968, plaintiff, Charles R. Brooks, purchased the mortgaged property and assumed the obligations of the mortgage. The mortgage called for monthly payments of principal and interest and in this language required advance payments of sums equal to insurance, ground rents, taxes, and special assessments:

" * * * the Mortgagor will pay to the Mortgagee, on the first day of each month * * * the following sums:

* * * * * *

(b) A sum equal to the ground rents, * * * plus the premiums * * * on policies of fire and other hazard insurance * * * plus taxes and assessments * * * to *be held by the Mortgagee in trust* to pay said ground rents, premiums, taxes, and special assessments." (Emphasis supplied)

The practice of the Valley National Bank was to place the advance payments in demand deposit accounts, referred to by the litigants as impound accounts. During the time between their receipt and disbursement, the bank used the impound funds as its own for general investment purposes. The cost to the Valley National Bank of servicing the Brooks impound account averaged $8.27 per annum. This is typical of the costs attributable to impound accounts serviced by the bank. If interest had been paid on the average daily balance on the Brooks account at the prevailing rate of passbook servicing, the amount thereof in 1969 would have been $8.91, in 1970, $6.74, and in 1971, $6.68.[1]

There is no mystery as to why lending institutions require the advance of funds such as these. In 1933, 26.3% of the property taxes in the 200 largest cities of the United States were delinquent. Substantial numbers of foreclosures were caused by the inability of the mortgagor to pay annual taxes or assessments. As a result, lending institutions began to require monthly tax payments upon the theory that a homeowner would find it easier to pay in installments of $\frac{1}{12}$ rather than meeting a single payment in an annual charge. *Buchanan v. Brentwood Federal Savings and Loan Association*, 457 Pa. 135, 320 A.2d 117, 121 (1974).

The majority have cited to ten lawsuits which have been brought against lending institutions in various courts of this country to compel reimbursement for the use of impound funds, or what is usually described as escrow funds. Because of the difference in the language used in the various instruments being construed, none can be considered as precedent for the holding here. They do, however, establish a usage, the customary practice by lending institutions in the United States. Without exception, interest was not paid nor were the earnings on the investment of the impound funds credited to the mortgagor.

I reject immediately the holding by the majority that the impound funds deposited with the Valley National Bank are not trust funds. If the impound funds are not held pursuant to a trust and the mortgagee goes into bankruptcy, mortgagors would have no greater right to the impoundments than a general creditor. A court should not read out of the contract language which has a clear and obvious purpose, language which, as in the present case, is designed to secure and protect the mortgagor from a contingency against which he cannot otherwise protect himself.[2]

1. A survey of 1,141 savings and loan associations with total assets of 90.3 billion dollars establishes that similar figures prevail nationally. *See* The Tax Escrow Story, Savings and Loan News, pp. 106–109 (March, 1973).

2. The recent insolvencies of such institutions as the Franklin National of New York, with

The mortgage in plain English provides that the impound funds are "to be held * * * in trust" to pay rents, insurance, taxes and special assessments. Simple, unambiguous language must be given its ordinary and usually accepted meaning. *Sam Levitz Furniture Co. v. Safeway Stores, Inc.,* 105 Ariz. 329, 464 P.2d 612 (1970); *Brady v. Black Mountain Investment Co.,* 105 Ariz. 87, 459 P.2d 712, 41 A.L.R.3d 1 (1969).

The ordinary, accepted meaning of the word "trust" as defined by Webster is "a property interest held by one person for another." Webster, Third New International Dictionary (1965). Or as has been succinctly put:

> "A trust is a relation between two persons, by virtue of which one of them as trustee holds property for the benefit of the other. * * * Every deposit is a trust, except possibly general bank deposits; every person who receives money to be paid to another or to be applied to a particular purpose is a trustee * * *." *Vosburgh's Estate,* 279 Pa. 329, 123 A. 813, 815 (1924).

In the instant case, the bank received the impound funds to be applied to the payment of taxes and insurance. A trust was created not alone because the word "trust" was used in the mortgage, but because the bank received money to be applied to a particular purpose.

A court may not fashion a new contract for the parties simply because it appears inconvenient to enforce the one the parties agreed upon. It is not within either the function or power of the court to alter, revise, modify, rewrite or remake a contract for the parties; its duty is confined to enforcing the contract which they have made for themselves. *Goodman v. Newzona Investment Co.,* 101 Ariz. 470, 421 P.2d 318 (1966); *Graham County Electric Cooperative, Inc. v. Town of Safford,* 95 Ariz. 174, 388 P.2d 169 (1963); *Young v. Border Broadcasting Co.,* 75 Ariz. 298, 255 P.2d 888 (1953); *Valley National Bank of Phoenix v. Shumway,* 63 Ariz. 490, 163 P.2d 676 (1945); *Russell v. The Golden Rule Mining Co.,* 63 Ariz. 11, 159 P.2d 776 (1945).

The positive language by which the bank promised to hold the impound funds in trust should not be read out of the mortgage by the simple device of filing an affidavit by an officer of the bank that a trust relationship was not intended. If the word "trust" does not here mean trust, no legal instrument, however important, plainly written or carefully drawn, is safe from tinkering.

It is the appellant's position that not only is a trust created, but, further, since the bank invested the impound funds, he should receive the benefits from their investment. The mortgage, however, does not contain a statement of the bank's duty relative to the care of the impound funds, nor does it contain any language from which it can be concluded that the mortgagor is to receive the benefits from an investment of the funds. Brooks relies on the general rule of law that it is the duty of a trustee to protect the interests of the beneficiary of a trust by the exercise of reasonable care and diligence in the management of the trust property, *Bulla v. Valley National Bank of Phoenix,* 82 Ariz. 84, 308 P.2d 932 (1957), and the general rule that the trustee has a duty to invest the trust property so that it is made productive for the beneficiary. Restatement (Second) of Trusts, § 181 (1959). Where, however, a rule of law might otherwise be applicable to an agreement, custom or usage may make such rule of law inapplicable. Williston, Law of Contracts, § 648 (3rd ed. 1961).

The practice of requiring impound payments has existed since the early 1930's.

assets of four billion dollars, the Hamilton National, the third largest failure in the United States banking history, the Lincoln Thrift Association in Arizona, with assets in excess of $38,000,000, and 13 bank failures in 1975, point up sharply the mortgagor's need to be secure in his advance payments.

In every instance, without exception, where a suit has been brought to compel payment of interest or the earnings on the investment of the impound funds, the lending institution has not paid the mortgagor for the use of the impound funds. Nor is there anywhere. the slightest suggestion that the Valley National Bank or any lending institution ever paid for the use of impound funds.

While a few isolated instances will not prove a usage, one so firmly established for so many years nationwide should be controlling. A usage will be binding if it is uniform, long established, and so well known that it can be said that the parties contracted with reference to it and the failure to conform to it would be the exception. *Cleveland etc. R.R. Co. v. Jenkins*, 174 Ill. 398, 51 N.E. 811. Nor is a usage invalid because its effect is different from a general rule of law.

"It is well settled that a trade usage which is contrary to a statute or which contravenes public policy is invalid and may not be invoked; but where a rule of law is of a character that the parties may make it inapplicable to their contract by express agreement, they may likewise render it inapplicable by implied agreement or by usage." *Wolfe v. Texas Co.*, 83 F.2d 425, 431 (10th Cir. 1936).

I am therefore of the opinion that by banking usage neither interest nor earnings on investment was expected to be credited to the mortgagor.

For the foregoing reasons I would affirm the judgment of the court below.