MEMORANDUM AND ORDER
 

 YOUNG, District Judge.
 
 [1]
 

 I. INTRODUCTION
 

 The plaintiff Margaret Adelman (“Adel-man”) brings a multi-count action against
 
 *1036
 
 defendants Martha Christy (“Christy”) and Joseph Christy (“Joseph Christy”) (husband and wife, collectively, “the Christys”), Future Med, Inc. (“Future Med”) and TriMedica, Inc. (“TriMedica”). The thrust of Adelman’s action is that Christy
 
 [2]
 
 improperly used Adelman’s research work in order to write a book on a medical practice known as “urine therapy.” Christy admittedly wrote a urine therapy book, but royalties and copyright rights from that book, as outlined in the parties’ first (1992) contract, were not given to Adelman. Furthermore, Adelman alleges that Christy breached a second (1994) contract related to the book by terminating the advertising and promotional arrangements therein without providing due compensation. Adelman is suing the Christys (in addition to Future Med and TriMedica, who are allegedly their corporate affiliates in these transactions) for (i) breach of contract; (ii) copyright infringement; (iii) breach of fiduciary duty; and (iv) unjust enrichment. Adelman has filed the instant motion for partial summary judgment on the breach of contract count. The Christys (and their corporate co-defendants) have filed motions for summary judgment on the other three counts.
 

 II. FACTUAL BACKGROUND
 

 In 1987, Adelman (a resident of Florida) co-authored and copyrighted a book entitled
 
 The Miracles of Urine Therapy. See
 
 Compl. ¶ 5. Prior to and following the writing of that book, Adelman compiled extensive materials on the subject of medical usage of urine, including clinical studies and out-of-print sources.
 
 See id.
 
 On March 16, 1992, Adelman entered into an agreement with Christy (an Arizona resident) whereby Christy would use Adel-man’s research materials to write a new book on urine therapy (the “1992 Agreement”).
 
 See id.; see also
 
 Defs.’ Statement of Facts Ex. A. In return for contributing her materials, Adelman received a $1000 advance royalty payment, and was to receive joint copyright in the forthcoming book and 50% of the net profits generated by book sales.
 
 See
 
 Compl. H! 10, 15. Promotion and marketing rights to the book were to be held by a yet-unformed corporation, with Adelman owning 30% of the corporation.
 
 See id.
 
 II 9. The 1992 Agreement anticipated that “[fjormal contracts and articles of incorporation will be drawn up prior to publishing and marketing the book.” Defs.’ Statement of Facts Ex. A.
 

 According to Adelman, at the time she signed the 1992 Agreement, she brought to Arizona “either two or three large boxes of material” containing “many hundreds of letters” and “testimonials” relating to her research, and at that time delivered them to Christy'.- Tr. of Proceedings Before the Arbitrator (“Arbitration Transcript”) at 24.
 
 [3]
 
 Christy claims that she only received three documents from Adelman at the time the contract was signed, namely “two books that were Xeroxed and a medical research paper” and that she “never” received anything else from Adelman. Arbitration Transcript at 205-06. The 1992
 
 *1037
 
 Agreement was drafted (without assistance of counsel) as if the entirety of the research materials had already been delivered to Christy: “Martha and Joseph S. Christy (MJC), hereby acknowledge, the receipt of materials consisting of previously published books, reference works, personal letters and public relations pieces belonging to Margie Adelman Sanchez (MAS), regarding the topic of urine therapy.” Defs.’ Statement of Facts Ex. A. “MJC agree that these materials have been received from Margie Adelman Sanchez on March 16, 1992, and that they will be used expressly and solely for the purpose of composing a book on the subject of urine therapy ____”
 
 Id.
 
 Christy explains, however, that this language was chosen “[bjecause Margie [Adelman] said she had them with her, and that she was going to give me the materials. She didn’t say what materials, but she said that she was going to give me materials.” Arbitration Transcript at 204-05. Christy claims that the three items were given to her at that time and that Adelman said she would send the rest by mail.
 
 See id.
 
 at 205.
 

 The parties remained in contact until approximately January 1993.
 
 See id.
 
 at 206. At that time, according to Christy, all communications from Adelman stopped. Christy was ready to write, the new book in April or May of 1993 but Adelman’s phone was disconnected and Adelman’s boss believed she had “left town.”
 
 Id.
 
 at 208. Adelman denies she was unreachable.
 
 See id.
 
 at 31. Although she moved “once or twice” during the time in question, Adelman’s name and number allegedly were always listed in the phone book and she always had a forwarding address.
 
 See
 
 Arbitration Transcript at 31. Adel-man did not attempt to contact Christy because she believed that Christy was seriously ill and Adelman did not want to pester her about the book.
 
 See id.
 

 In light of Adelman’s alleged absence, Christy claims to have used, on her own initiative, document retrieval, databases, libraries, and other research methods to complete the research for the new book. Because of the parties’ lack of contact, the “formal contracts” contemplated by the 1992 Agreement never were made.
 

 In 1994, apparently after discovering that Christy had written the new urine therapy book entitled
 
 Your Own Perfect Medicine (“Perfect Medicine
 
 ”), Adelman reappeared and claimed rights in the new book. On June 24, 1994, the parties entered into a new and more detailed publishing and sales agreement (the “1994 Agreement”).
 
 See
 
 Defs.’ Statement of Facts Ex. C. Christy argues that the 1994 Agreement was entered into in order to avoid litigation concerning rights over
 
 Perfect Medicine. See id.
 
 II8. The Arbitration Transcript supports that assertion. Adel-man stated, “I felt that, you know, I had two options at that point, to either sue them at that point and make some trouble or to, you know, try to go on from there and put — you know, make an agreement of some kind that would satisfy both parties and really go on with our work.” Arbitration Transcript at 36.
 

 The 1994 Agreement states that it “supersedes and replaces any and all prior written or verbal agreement between the parties with respect to the subject matter covered by this agreement.” Defs.’ Statement of Facts Ex. C. The 1994 Agreement specified that Adelman would be named the joint holder of
 
 Perfect
 
 Medicine’s copyright at the time that the first 5,000 books were sold. It also provided for the payment of royalties to Adelman (50% of book sales and 40% of sales of book-related products) and required Adelman to be responsible for all public relations and information requests on behalf of the book and book products. The 1994 Agreement further contained a termination clause in the event that Adelman failed to perform reasonably her duties or in the event of termination for other reasons.
 

 Christy and the other defendants terminated Adelman’s services on August 21, 1994 (less than two months after the signing of the 1994 Agreement), ostensibly under a claim that Adelman was not perform
 
 *1038
 
 ing her responsibilities reasonably.
 
 See
 
 Defs.’ Statement of Facts 1Í16. Adelman now asserts that she was performing reasonably, and cites as examples her efforts to secure approximately eight promotional radio shows, her sending books to reviewers, and other similar activities.
 
 See
 
 Arbitration Transcript at 42-44.
 

 Adelman’s inclusion of TriMedica as a defendant seems somewhat collateral. Adelman held 1000 shares of Trimedica common stock, issued because of her minor involvement in an oxygen-related venture, unrelated to urine therapy.
 
 See
 
 Joseph Christy Aff. at 2. TriMedica never held any annual or special meetings, never elected officers or directors, and never engaged in any relevant activity. See
 
 id.
 
 Furthermore, TriMedica never had any corporate revenue or earnings, did not generate books or records and essentially “never operated.”
 
 Id.
 
 TriMedica dissolved on February 10,1997.
 

 III. RELEVANT LEGAL STANDARDS
 

 Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party, “the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(c). A “genuine” issue is one that “properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A “material” fact is one that “might affect the outcome of the suit” under the applicable legal standard.
 
 Id.
 
 at 248, 106 S.Ct. 2505.
 

 IV. ANALYSIS
 

 A. Adelmaris Motion for Partial Summary Judgment
 

 Adelman brings a motion for partial summary judgment on the issue of breach of contract (Count I), requesting a-determination of liability as matter of law. Adelman seeks judgment under both the 1992 and 1994 Agreements, necessitating an evaluation of their relationship.
 

 1. The 1994 Agreement Is a Valid, Enforceable Contract
 

 Despite Adelmaris argument to the contrary, the 1994 Agreement is a valid contract supported by consideration. The 1994 Agreement imposed the new duty of publicity upon Adelman.
 
 See
 
 Defs.’ Statement of Facts Ex. C § II.A at 2. It also created a more durable royalty obligation for Christy and assigned costs for potential product liability to Christy.
 
 See id.
 
 §§ IV, VI at 3-5. Furthermore, Adelman herself indicated at the Arbitration that the 1994 Agreement was voluntarily created to ward off litigation under the 1992 Agreement, indicating that both parties gained value by sparing themselves a lawsuit.
 
 See
 
 Arbitration Transcript at 36. Finally, and definitively, Adelman admits in her own Complaint that “The Publishing/Sales Agreement constituted a valid and enforceable contract.” Compl. 1118. Given this admission, any assertion by Adelman in her motion (or replies) that the 1994 Agreement lacked consideration or was otherwise invalid is spurious.
 

 2. The 1994 Agreement Supersedes and Replaces All Rights Under the 1992 Agreement.
 

 The 1994 Agreement states, “This Agreement supersedes and replaces any and all prior written or verbal Agreements between -the parties with respect to the subject matter covered by this Agreement.”
 
 See
 
 Defs.’ Statement of Facts Ex. C. The “subject matter” of the agreement concerns distribution of revenues, responsibilities of the parties, book promotion and publicity, product liability, and copyrights.
 
 See id.
 
 These are the very same
 
 *1039
 
 subject areas considered by the original 1992 Agreement, although some of the arrangements are different or more detailed.
 
 See
 
 Defs.’ Statement of Facts Ex. A. The 1994 Agreement does not indicate anywhere that it was created only to satisfy the last paragraph of the 1992 Agreement, the provision contemplating formal contracts prior to publication.
 
 [4]
 
 Furthermore, it is undisputed that the 1994 Agreement was drafted in response to the parties’ conflict or misunderstanding in 1994 about the status of their obligations under the 1992 Agreement. The parties agree that the 1994 Agreement was created to settle the assertion of each party that the 1992 Agreement had been breached by the other, and to avoid litigation arising therefrom.
 
 See
 
 Arbitration Transcript at 36; Defs.’ Statement of Facts 1Í 8. Thus, both the language of the 1994 Agreement and the expressed intentions of the parties support the conclusion that the 1994 Agreement completely superseded and replaced the 1992 Agreement.
 

 “A contract will be considered as having been rescinded by the substitution of another and subsequent contract relating to the same subject-matter, where it appears to have been the intention of the parties, that the later contract should supersede the first one.... [citations omitted] Where the entire subject-matter is covered, and there is nothing on the face of the second agreement to show that it is intended to be supplemental to the original agreement, it supersedes and rescinds the original, not as a question of intention, but by operation of law, as a result of steps taken by the parties .... ”
 
 Flooring Sys., Inc. v. Radisson Group, Inc.,
 
 158 Ariz. 111, 113, 761 P.2d 733 (Ariz.Ct.App.1988),
 
 aff'd in part, rev’d in part on other grounds,
 
 160 Ariz. 224, 772 P.2d 578 (1989) (en banc);
 
 see also Demasse v. ITT Corp.,
 
 194 Ariz. 500, -, 984 P.2d 1138, 1146 (1999) (“There is no doubt that the parties to a contract may by their mutual agreement accept the substitution of a new contract for the old one with the intent to extinguish the obligation of the old contract .... ”).
 

 Not every mutually-agreed replacement of contractual obligations, however, will actually extinguish the original obligations. Under Arizona law, a contract under which an obligee promises to accept a stated
 
 performance
 
 in satisfaction of the obligor’s existing duty is known as an “accord and satisfaction.”
 
 See Owens v. Hunter,
 
 91 Ariz. 7, 10, 368 P.2d 753 (1962). If the new obligation is not performed, the obli-gor can still sue on the
 
 original
 
 duty and is not limited to enforcing only the new promise.
 
 See id.
 
 Here, the 1994 Agreement is not, however, an accord and satisfaction. Rather it is a substitution contract. A substitution contract exists when “a promise of substituted performance is accepted in satisfaction of the original duty.”
 
 K-Line Builders, Inc. v. First Fed. Sav. & Loan Assoc.,
 
 139 Ariz. 209, 213, 677 P.2d 1317 (Ariz.Ct.App.1983). The distinction between these two principles is critical. If the parties intend that only actual performance. of the new obligation would result in satisfaction of the original duty, the original duty is discharged only upon performance of the new obligation.
 
 See Owens,
 
 91 Ariz. at 10, 368 P.2d 753;
 
 Moreno v. Russell,
 
 47 Ariz. 38, 42-43, 53 P.2d 411 (1936). If, however, the parties intend that the
 
 promises
 
 to undertake new contractual arrangements themselves satisfy the original obligations, the original duty is extinguished as soon as the new contract is entered into.
 
 See K-Line,
 
 139 Ariz. at 213, 677 P.2d 1317 (“If the parties intend the new contract to replace all the provisions of the earlier contract, the contract is a substituted contract.”); Restatement (Second) of Contracts § 289 (1979). The undisputed record before the Court shows that the parties intended the new agreement to substitute for the original obligations of all the parties. The new agreement did not, for example, take the form of
 
 *1040
 
 a reduced payment amount, which would be typical of an accord and satisfaction.
 
 [5]
 
 Rather, the parties agreed to a more sophisticated restructuring and refining of the duties they
 
 each
 
 owed to the other. These promises themselves extinguished any duties the parties had under the 1992 Agreement.
 

 The essential elements of a valid novation are a previously valid obligation, the agreement of all parties to a new contract, the extinguishment, of the old obligations, and the validity of.the new one.
 
 Buerger Bros. Supply Co. v. El Rey Furniture Co.,
 
 43 Ariz. 472, 32 P.2d 1029 (1934). It is not essential for a valid novation that assent and acceptance of the terms thereof be shown by express words, either spoken or written, but may be implied from the facts and circumstances surrounding the transaction and the conduct of the parties thereafter.
 
 Dunbar v. Steiert,
 
 31 Ariz. 403, 253 P. 1113 (1927);
 
 Buerger Bros. Supply Co. v. El Rey Furniture Co.,
 
 supra;.
 
 Shiflet v. Marley,
 
 58 Ariz. 231, 118 P.2d 1107 (1941);
 
 Catalina Groves v. Oliver,
 
 73 Ariz. 38, 236 P.2d 1022 (1951);
 
 Steele v. Vanderslice,
 
 90 Ariz. 277, 367 P.2d 636 (1961).
 

 United Security Corp. v. Anderson Aviation Sales Co., Inc.,
 
 23 Ariz.App. 273, 275, 532 P.2d 545 (1975). It is evident that the parties have satisfied these elements. The 1994 Agreement was a novation that replaced
 
 in toto
 
 the 1992 Agreement. The 1994 Agreement is, therefore,, the sole remaining legally-operative document among the parties. Adelmaris claims must stand or fall on the basis of what is in the 1994 Agreement and activities relating thereto.
 
 [6]
 

 3. Termination Under the 1994 Agreement
 

 The termination provisions are at the center of this dispute, and therefore are reproduced here (original formatting preserved):
 

 IV. FAILURE TO. PERFORM / TERMINATION
 

 A. Should [Adelman] for any reason decide that she no longer desires to perform any of her responsibilities as set forth in Par. II A, section 1. and elsewhere in this Agreement or is unable to reasonably perform these responsibilities (see Par. V. of this Agreement), this Agreement shall terminate and • [Adelman]’s compensation in regards to the sale of the books and related products shall be changed in the following manner:
 

 1. In the event [Adelman] ceases to reasonably perform her responsibilities (see Par. V) as set forth herein at any time after the signing of this Agreement, this Agreement shall terminate under the following conditions:
 

 1. (a) [Future Med] shall be obligated to pay [Adelman] 50% of the net profits from the sale of the book and [Physician’s Guide] and 40% of the net profits of book-related product sales for a period equal to whatever period of time [Adelman] has fulfilled her responsibilities under this Agreement, (e.g. if [Adelman] fulfills her responsibilities under this contract for no more than 6
 
 *1041
 
 months following the signing of this Agreement, [Future Med] will pay [Adelman] 50% of the net profits from the sales of the book and [Physician’s Guide] and 40% of the net profits from book-related product sales for the 6 months from the date of the signing of this Agreement. If [Adelman] fulfills her responsibilities under this contract for 5 years, [Future Med] will pay [Adelman] 50 % of the net profits from sales of the book and [Physician’s Guide] and 40% of the net profits from the sales of the book and book-related products for 5 years from the date of the signing of this Agreement, and so forth) after which time all obligations of [Future Med] to [Adelman] under this Agreement shall cease.
 

 2. In the event of termination, [Adel-man] shall continue to receive 50% of the net profits from the sale of YOPM [the
 
 Perfect Medicine
 
 book] and [Physician’s Guide] for a period of 10 years from the signing of this Agreement, after which time all obligations under this Agreement of [Future Med/ Christy] to [Adelman] shall cease.
 

 3. This Agreement shall not terminate, except under the above-mentioned circumstances, but will continue indefinitely for so long as [Adelman] and [Christy] shall jointly continue the promotion and sales of the book and as long as the terms of this Agreement are complied with.
 

 Defs.’ Statement of Facts Ex. C at 3-4.
 

 These termination provisions anticipate two explicit causes of termination: (1) “Should [Adelman] for any reason decide that she no longer desires to perform”; and (2) “[Adelman] is unable to reasonably perform.”
 
 Id.
 
 The next two subpara-graphs outline termination “in the event that [Adelman] ceases to reasonably perform her responsibilities.”
 
 Id.
 
 In that case, Adelman will receive compensation reflecting the length of time she performed her duties. The next subparagraph causes much difficulty. It merely provides for compensation “[i]n the event of termination” and assigns Adelman 50% of the net profits for 10 years, a provision much more profitable to Adelman than the prior one. The question, then, is what to make of this poorly drafted second subparagraph which suggests broad applicability. There are several semantic possibilities that could be used to cure the defective language:
 

 (a) It meant to say “In the event of termination by Christy ... ”; or
 

 (b) It meant to be consistent with the first of the two contemplated methods of termination, the first of which has already been spelled out. Thus: “In the event Adelman should for any reason decide that she no longer desires to perform any of her responsibilities ... or
 

 (c) The number “2.” should really be a letter “B.” in order to juxtapose it with the paragraph “A.” which allows Adel-man to terminate on the basis of inability or lack of desire. Thus, it binds Christy if termination occurs for a reason other than Adelman’s inability or lack of desire; or
 

 (d) The 50%/10 year royalty provision exists concurrent with the standard royalties. Therefore, if the agreement is terminated for any reason, Adelman receives her 40%/50% royalty reflecting her time worked in addition to a guaranteed 50% royalty for ten years. This construction, however, seems inconsistent with the phrase in the former paragraph that “all obligations of [Future Med] to [Adelman] under this Agreement shall cease.”
 

 Although poorly drafted, the intention of the parties, suggested by their history of contractual dispute, seems to have been to provide each party with a different option to terminate, consistent with possibilities (a) or (c) above. If Adelman chooses to terminate or if she poorly performs her duties, she will receive royalties for a peri
 
 *1042
 
 od of time equal to whatever time she worked. If she did not work at all, this royalty could be as low as zero. On the other hand, if Christy terminates for a reason other than Adelman’s desire or poor performance, Adelman will receive 50% of the net profits for 10 years. This 10-year royalty provision guarantees income for Adelman no matter what (unless
 
 Perfect Medicine
 
 fails to turn a profit, of course). It is quite clearly a better deal for Adelman than the first method of termination. To read these provisions as suggested by possibility (b) would allow Adelman to preempt a determination that she is unreasonably performing by voluntarily choosing to terminate, resulting in a windfall guaranteed 10 year royalty. It is nonsensical that Adelman should get more for doing less and surely that was not the intention of the parties. The correct interpretation of the termination provision is to apply paragraph IV.A.2. to situations in which the contract is terminated for a reason other than Adelman’s desire or her unreasonable performance.
 

 4. A Disputed Material Issue of Fact Remains
 

 The 1994 Agreement defines unreasonable performance for purposes of termination under paragraph IV.A:
 

 A. Unreasonable, or unsatisfactory performance on the part of [Adelman], as referred to in Par. IV of this Agreement shall be defined as a definitive cessation of active participation or lack of willingness on the part of [Adelman] to promote the book and related products, including but not limited to such circumstances as consistently procuring few or no public relations bookings on behalf of the book, consistently failing to be available for speaking engagements, and promotional campaigns; consistently failing to perform reasonable requests by [Future Med] to assist in mailings, advertising campaigns, marketing and sales efforts, and other day to day activities required for the successful marketing and promotion of the book and book related products.
 

 B. Short term failure to perform (meaning 2 months or less) because of illness, personal and family matters, etc. shall not be considered as unreasonable performance and shall not constitute failure to perform. [Adelman] will inform [Future Med] in writing of any such short-term circumstances which prevent or interfere with her fulfillment of her responsibilities under this contract and of her need to discontinue or decrease her responsibilities for the period of time mentioned in this paragraph (2 months or less).
 

 Defs.’ Statement of Facts Ex. C at 4.
 

 Adelman was terminated less than two months after signing the 1994 Agreement. There ought be some doubt as to whether a “definitive cessation” and “consistent” behavior may even be shown in so short a period of time at the start of the promotion duties. It is possible, however, that if Adelman did absolutely nothing to fulfill her obligations during those two months (without notice of illness or family matters), termination would have been warranted under the terms of this clause. On the other hand, if Adelman had started in earnest to promote
 
 Perfect Medicine
 
 and reláted products, it is difficult to imagine how a consistent cessation of such behavior would ‘ emerge after only eight weeks. Adelman claims to have booked around eight radio shows, to have put out many leads, sent books to critics for review, and investigated trade shows.
 
 See
 
 Arbitration Transcript at 42-44. Christy claims that Adelman arranged only a handful of public relations bookings, no television appearances, no speaking engagements, and no advertising campaigns.
 
 See
 
 Defs.’ Resp. to Pl.’s Mot. for Partial Summ. J. at 10. It stands to reason that Adelman was terminated for
 
 some
 
 reason and Adelman has not suggested what that reason may be, other than that Christy was disappointed in Adelman’s performance. There remains a genuine issue of
 
 *1043
 
 material fact as to what Adelman’s actual promotional activities were and whether those activities fulfilled her obligations under the 1994 Agreement. This Court, therefore, denies Adelman’s motion for partial summary judgment on the breach of contract claim (Count I).
 

 B. Defendants’ Motion for Summary Judgment on Adelman’s Claims for Copyright Infringement
 

 Defendants Christy, Joseph Christy, Future Med, and Tri-Medica all move for summary judgment on Adelman’s copyright infringement claims against them.
 

 Adelman has alleged that the defendants have failed to account to her for profits derived from
 
 Perfect Medicine
 
 and have “exceeded the scope of their license for use of the [research] compilation.” Compl. U 25. She asserts that she “owns the copyright to the compilation of research materials.”
 
 Id.
 
 It 26. To support her claim, Adelman has obtained a copyright registration of her work; namely, a bibliography of various books and articles regarding urine therapy called “Urine therapy sources.”
 
 See
 
 PL’s Statement of Facts Ex. D. Although Adelman attempted to register the list as a
 
 “compilation
 
 of various books and articles regarding urine therapy,” the U.S. Copyright Office notified Adelman that it could only register material actually deposited with it, which appeared to be a bibliography.
 
 Id.
 
 The Copyright Office had previously written Adelman’s counsel advising that special relief was unavailable for registration of materials not deposited by reason of their being in the possession of Christy. The bibliography, attached as Exhibit D to the Plaintiffs Statement of Facts, appears to be selected portions of a database or catalog of Adelman’s work. It is arranged chronologically.
 

 Despite Adelmaris successful registration of copyright over the bibliography, her argument for copyright infringement in this case misapplies copyright law. As a holder of a copyright in her bibliography, Adelman is entitled to the exclusive right to reproduce the copyrighted work in copies, to prepare derivative works based upon the copyrighted work, and to distribute copies of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.
 
 See
 
 17 U.S.C. § 106. Adelman may therefore successfully claim copyright infringement if Christy engaged in any of those activities, concerning the bibliography, without a license.
 
 [7]
 

 Adelman owns a copyright in the listing of reference works generated by her research into urine therapy (the “Bibliography”). Such a listing is in reality a compilation of publicly-available facts. Compilations are protected under 17 U.S.C. § 103(a), defined as a work “formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.” 17 U.S.C. § 101. In
 
 Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.,
 
 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), the Supreme Court held that the names and phone numbers in a white pages phone book were not selected, coordinated or arranged in a sufficiently original way to afford copyright protection.
 

 Where the compilation author adds no written expression but rather lets the facts speak for themselves, the expressive element is more elusive. The only conceivable expression is the manner in which the compiler has selected and ar
 
 *1044
 
 ranged the facts. Thus, if the selection and arrangement are original, these elements of the work are eligible for copyright protection.
 

 Id.
 
 at 349, 111 S.Ct. 1282. Adelman’s Bibliography appears to be the printout of a computer research query or database, arranged in chronological order.
 
 See
 
 Pl.’s Statement of Facts Ex. D. Although Adel-man may have invested time and money in compiling this list, the Bibliography is only subject to minimal protection under copyright law. “[T]he copyright in a factual compilation is thin. Notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another’s publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement.”
 
 Feist,
 
 499 U.S. at 349, 111 S.Ct. 1282.
 

 Thus, even if Christy had reproduced and sold copies of a similar
 
 bibliography,
 
 Adelman’s grounds for relief on the basis of copyright infringement would be weak. Christy is not alleged to have copied or distributed a bibliography, however. Rather, Adelman alleges that Christy used the
 
 information
 
 contained in the bibliography as a source for
 
 Perfect Medicine.
 

 Perfect Medicine
 
 is not a bibliography. Instead, it is a new book on the topic of urine therapy. There is no allegation that Christy has produced, copied, or distributed any other printed thing relevant to the copyright claim other than
 
 Perfect Medicine.
 
 Adelman provides in her Response to Defendants’ Statement of Facts a comparison chart of the sources in her Bibliography and locations in the new book where those sources have been cited. Even assuming that the chart is an undisputed description of facts, it cannot support a claim of infringement. Christy’s actions in using the sources in the Bibliography, if true, may represent a shortcut to the fruits of Adelman’s research labor, but do not indicate a violation of any of the rights granted by Title 17. The Supreme Court clearly rejected any “sweat of the brow” basis for copyright in
 
 Feist. See Feist,
 
 499 U.S. at 360, 111 S.Ct. 1282. Further, Adelman has not shown any evidence of “substantial similarity” between
 
 Perfect Medicine
 
 and her Bibliography, a key element of infringement.
 
 See Worth v. Sel-chow & Righter Co.,
 
 827 F.2d 569, 571 (9th Cir.1987). Rather, she merely shows a cross-reference of sources, not an appropriation of the Bibliography’s expressive features.
 

 To the extent that Adelman claims some form of copyright in the
 
 underlying
 
 source items in the Bibliography — namely the materials she allegedly turned over to Christy — Adelman’s reasoning is flawed. It is undisputed that Adelman does not hold a copyright in any of the underlying research sources. She holds copyright only in what she has created: a compilation of source material on her specific topic. Her doubtless hard work of compiling the list of relevant sources does not vest in Adelman a copyright that would disallow others from using those original sources for research. Use of the sources listed in the Bibliography does not appropriate Adelman’s
 
 expression,
 
 which is the true subject of copyright law.
 
 See Narell v. Freeman,
 
 872 F.2d 907, 910-11 (9th Cir. 1989) (“Copyright law protects only an author’s expression. Facts and ideas within a work are not protected.”);
 
 Landsberg v. Scrabble Crossword Game Players, Inc.,
 
 736 F.2d 485, 488 (9th Cir.1984) (“Similarity of expression must be established because it is an axiom of copyright law that copyright protects only an author’s expression of an idea and not the idea itself.”);
 
 see also Miller v. Universal City Studios, Inc.,
 
 650 F.2d 1365, 1372 (5th Cir.1981) (“To hold that research is copyrightable is no more or no less than to hold that the facts discovered as a result of research are entitled to copyright protection.”).
 

 Furthermore, the allegation that Christy failed to account to Adelman for profits is not at all relevant to a copyright claim. Christy’s “duty to account to other co-owners for profits arises from equitable
 
 *1045
 
 doctrines relating [to] unjust enrichment and general principles of co-ownership, and does not amount to an infringement claim.”
 
 Zuill v. Shanahan,
 
 80 F.3d 1366, 1369 (9th Cir.1996) (citing
 
 Oddo v. Ries,
 
 743 F.2d 630, 632-33 [9th Cir.1984]).
 

 There are no facts presented, either disputed or undisputed, that would support a claim for copyright infringement. Consequently, Christy’s motion for summary judgment on Adelman’s claims for copyright infringement is granted.
 

 C. Defendants’ Motion for Summary Judgment on Adelman’s Claims for Unjust Enrichment and for Partial Summary Judgment on Adelman’s Claim for Breach of Contract
 

 1. Adelman’s Claim for Unjust Enrichment
 

 In her Complaint, Adelman claims to have made available to the Christys her expertise in the area of urine therapy, her compilation of materials from her research, and her labor to promote book sales.
 
 See
 
 Compl. 1137. Adelman further alleges that the Christys did not compensate her for those contributions.
 
 See id.
 

 By her own admission, Adelman was subject to a valid, written contract governing all of her contributions to the Christys. Even though the parties disagree about which Agreement applies, the undisputed facts before this Court show that at least one agreement between the parties exists which contemplates Adelman’s contributions.
 
 [8]
 
 “[Wjhere there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.”
 
 Brooks v. Valley Nat’l Bank,
 
 113 Ariz. 169, 174, 548 P.2d 1166 (1976) (citation omitted);
 
 see also Sutter Home Winery, Inc. v. Vintage Selections, Ltd.,
 
 971 F.2d 401, 408-09 (9th Cir.1992).
 

 The language in
 
 Brooks,
 
 quoted by the Defendants and often cited by Arizona courts, is misleadingiy overbroad. The mere existence of a contract governing the dispute does not automatically invalidate an unjust enrichment alternative theory of recovery. A theory of unjust enrichment is unavailable only to a plaintiff if that plaintiff has already
 
 received
 
 the benefit of her contractual bargain.
 
 See USLife Title Co. of Arizona v. Gutkin,
 
 152 Ariz. 349, 355, 732 P.2d 579 (Ariz.Ct.App.1986) (when a plaintiff does not obtain the benefit of its bargain, she is “free to pursue a claim for unjust enrichment”); Restatement (First) of Restitution § 107 (1936). Adelman claims that the 1994 Agreement was breached by Christy less than two months after it arose, and after she had made efforts to publicize
 
 Perfect, Medicine.
 
 She allegedly has failed to receive compensation for those efforts as provided by the 1994 Agreement or otherwise. Although Adelman’s recovery under an unjust enrichment theory may be less than her recovery under a breach of contract theory,
 
 [9]
 
 she is entitled to pursue that alternative theory although she will, of course, be barred from collecting a double recovery should she prevail on the merits at trial.
 
 [10]
 
 Accordingly, upon reconsideration of this Court’s ruling from the bench on Novem
 
 *1046
 
 ber 4, 1999, this Court now determines that Christy’s motion for summary judgment on Adelman’s unjust enrichment claim (Count IV) should be denied.
 

 2. Breach of Contract Concerning Public Relations Efforts
 

 Adelman claims that the Christys breached the contract by, among other actions, “independently conducting public relations promotions without coordination and support for Plaintiffs public relations efforts.” Compl. II 20(a). This Court has already concluded that the 1994 Agreement is the only legally operative contract. That Agreement provides that “[Adelman] shall be responsible for all public relations promotions on behalf of the book and related products, including print, TV and radio. [Adelman] also agrees to receive all information requests which arise from such promotion and to mail information packets to all those who request them.”
 
 See
 
 Defs.’ Statement of Facts Ex. C. at II.A.1. The 1994 Agreement also provides that “both [Adelman] and [Christy] hereby agree to perform their responsibilities to market and promote the book as needed to insure sales of the book and related products for perpetuity.” Furthermore, “[Future Med] shall be responsible for all production, marketing, sales, distribution, mailing, inventorying and all promotions not performed by [Adelman] of said books and products, and for all costs incurred by these activities.”
 
 Id.
 
 at II.A.3. Although facially inconsistent, these provisions in the 1994 Agreement impose on Adelman a duty to be responsible for public relations promotions for the book while allowing Christy, through Future Med, to be responsible for “all promotions not performed” by Adelman. Thus the contract plainly contemplates the sharing of promotional responsibilities even though it simultaneously assigns Adelman responsibility for “all” promotions. Although this overlap may cloud an understanding of exactly what were Adelman’s duties under the contract (an issue which will emerge at trial of the termination provision), it by no means can be construed to hold Christy liable for breach merely for “independently conducting public relations promotions.” There is no requirement of “coordination and support” by Christy in the contract except that Christy must be responsible for all promotional costs and must pre-approve any expenses in writing.
 
 See
 
 Defs.’ Statement of Facts Ex. C at II.A.2. Adelman has not alleged that Christy stood in the way of Adelman’s efforts by withholding expense approval. On the contrary, Adelman herself has provided a list of her alleged promotional efforts from June 21, 1994, until at least October 13, 1994. In her Response to this motion, Adelman asserts that “Defendants hindered performance to set up a termination.” PL’s Resp. to Mot. for Summ. J. for Unjust Enrichment and Breach of Contract at 2. Aside from the notice of termination, which was certainly either a breach by Christy or a proper termination for cause, Adelman has not presented any facts showing that Christy took any actions to hinder Adelman’s performance of her duties. At most, Adelman alleges that Christy undertook independent promotional efforts. There is no allegation of interference with Adelman’s performance (other than the termination actually at issue). Under the language of the 1994 Agreement, simultaneous efforts to promote
 
 Perfect Medicine
 
 are an acceptable course of action for - Christy to have taken.
 
 [11]
 
 Christy’s motion for partial summary judgment on the breach of contract claim relating to independent promotional activities is therefore granted.
 

 D. Defendant’s Motion for Summary Judgment on Adelman’s Claims for Breach of Fiduciary Duty
 

 Count Three of Adelman’s Complaint charges Joseph Christy and Martha
 
 *1047
 
 Christy with breach of fiduciary duties “as directors and officers of’ TriMedica, Inc. In particular, Adelman claims that the Christys breached their fiduciary duties by failing to provide Adelman with notice of shareholder meetings, failing to distribute dividends from earnings, failing to maximize corporate earnings and by excluding Adelman from participation in the management and affairs of TriMedica.
 

 TriMedica, Inc. was initially formed as a venture to market and sell oxygen-related supplies and equipment.
 
 See
 
 Aff. of Joseph Christy If 2. Adelman was issued 1,000 shares of common stock in Trimedica due to her involvement in that venture. According to Joseph Christy’s Affidavit, TriMedica, Inc. was not connected in any way with urine therapy, with the book-research Agreements, or with the
 
 Perfect Medicine
 
 book.
 
 See id.
 
 1Í 8. TriMedica was duly incorporated under the laws of Arizona. It never held any shareholders meetings, however, nor did it elect officers or directors after Adelman had received her 1,000 shares.
 
 See id.
 
 TiiMedica had no corporate revenues or earnings, and did not generate any books or records. According to a document in the record that appears to be a printout of the Arizona Public Access System, Annual Reports were filed for 1993, 1994 and 1995.
 
 See
 
 PL’s Resp. to Defs.’ Statement of Facts Ex. B. TriMedica dissolved on February 10, 1997.
 
 See
 
 Aff. of Joseph Christy 113. The computer printout merely reads “revocation” on February 10, 1997, and does not provide an explanation.
 
 See
 
 PL’s Resp. Statement of Facts Ex. B. Under Ariz.Rev.Stat. § 10-1420 (1999), a corporation may be administratively dissolved if the corporation ceases to pay its fees or deliver its annual report to the state commission. Since the last annual report listed is 1995, it stands to reason that the corporation was dissolved in 1997 due to failure to file the 1996 and 1997 reports.
 
 [12]
 

 Adelman asserts that TriMedica was connected with
 
 Perfect Medicine.
 
 It is not disputed that
 
 Perfect Medicine
 
 was sold by a corporation called “HomeCure.” According to its Articles of Resolution, HomeCure was “created from the spin-off of the retail business of TriMedica
 
 International
 
 Incorporated” (emphasis added).
 
 See
 
 PL’s Resp. to Defs.’ Statement of Facts Ex. C. However, TriMedica
 
 International,
 
 an ongoing business, is a separate and distinct corporation from TriMedica
 
 Inc.,
 
 which was dissolved in 1997. The Christys have asserted this distinction in their motions memoranda. Furthermore, the existence of two corporate entities seems evident from the difference in names found in Adelman’s share certificate (“Tri-Mediea, Inc.”) and the HomeCure Articles of Resolution (“TriMedica International Incorporated”), as well as the name on an invoice (“TriMedica International, Inc.”).
 
 See
 
 PL’s Resp. to Defs.’ Statement of Facts Exs. A, C, D. Adelman evidently has mistaken TriMedica International for TriMedica Inc. There are no facts before this Court indicating that Adelman is a shareholder in TriMedica International or HomeCare, its spin-off. Therefore, Adelman’s only proper claim for relief on the basis of corporate fiduciary duties lies in the activities of TriMedica, Inc., the now-dissolved enterprise formed to engage in a venture unrelated to urine therapy.
 

 The remaining question before this Court therefore concerns the standard of fiduciary duty owed by the officers and directors of a corporation to its shareholders when that corporation fails to engage in any business whatsoever and essentially remains dormant until its dissolution.
 

 The Christys argue for summary judgment under the theory that a dormant company that engages in no business and holds no shareholder meetings cannot have violated fiduciary duties to its shareholders. Such an absence of activity, however, cuts exactly the opposite way. Corporations incorporated in Arizona “shall hold a
 
 *1048
 
 meeting of shareholders annually at a time stated in or fixed in accordance with the bylaws.” Ariz.Rev.Stat. § 10-701. Furthermore, “A corporation shall notify shareholders of the date, time and place of each annual and special meeting.” Ariz. Rev.Stat. § 10-705. “A corporation shall furnish its shareholders annual financial statements ... that include a balance sheet as of the end of the fiscal year, an income statement for that year' and a statement of changes in shareholders’ equity for the year.” Ariz.Rev.Stat. § 10-1620.
 

 Joseph Christy has admitted, in his Affidavit, that TriMedica never held annual or special meetings of its shareholders and never kept any corporate books or records. This is essentially an admission that the officers and directors of TriMedica (Joseph and Martha Christy) failed to comply with state law. TriMedica should have held annual meetings, even if there was no business to attend to, and should have generated and provided to its shareholders annual financial statements, even if those statements would only indicate zero assets and zero revenue. That is the only way by which shareholders such as Adelman would know that no business is taking place and that they are not missing out on opportunities to sell their shares, opportunities to bring a shareholders’ resolution, to propose a new business plan or to engage in other activity pertaining to their interest in the corporation. By providing absolutely no notice whatsoever to its shareholders as to the status and activity of the corporation, the Chrjstys have neglected their duties as officers and directors.
 

 Adelman therefore seems to have made out a claim for a technical violation of Arizona corporations law, and its underlying fiduciary obligations. According to the evidence in the record, however, Adelman was given the shares at no cost to herself. There were no assets of the corporation and no revenue was generated. No steps seem to have been taken by anyone, nor costs incurred, to develop the defunct business objective of Tri-Medica. Apparently it was an idea that just never got off the ground. Furthermore, Tri-Medica had nothing to do with the central dispute in this case: the urine therapy book contracts. Therefore it is quite likely that Adelman’s damages on this count will be zero, although this Court recognizes that Adelman has not yet had a chance to present evidence of damages. Nonetheless, the Court is unable to grant partial summary judgment on this claim in light of the facts before it.
 

 V. CONCLUSION
 

 For the foregoing reasons, on November 4, 1999, this Court: DENIED Adelman’s motion for partial summary judgment on the breach of contract claim (Count I) [Docket No. 84]; GRANTED Christy’s motion for summary judgment on Adel-man’s claims for copyright infringement (Count II) [Docket No. 37]; GRANTED Christy’s motion for partial summary judgment on the breach of contract claim relating to independent promotional activities [Docket No. 38]; and DENIED Christy’s motion for summary judgment on Adel-man’s breach of fiduciary duty claim (Count III). [Docket No. 39]
 

 In light of this Court’s reconsideration of the doctrine of unjust enrichment in Arizona, this Court’s order of November 4, 1999, as to Christy’s motion for summary judgment on Adelman’s unjust enrichment claim (Count IV) [Docket No. 38] is VACATED and the motion is now DENIED. Adelman is free to pursue her unjust enrichment claim at trial.
 

 [1]
 

 . Of the District, of Massachusetts, sitting by designation.
 

 [2]
 

 . Although both Joseph and Martha Christy were involved in the contractual transactions among the parties, it appears that Martha Christy was the more actively involved party. Thus, to remain consistent with the parties’ pleadings, the name “Christy” will be used to refer to actions taken by Martha Christy, on behalf of both herself and as agent for the other defendants.
 

 [3]
 

 . The parties have engaged in the voluntary, non-binding arbitration provided by Local Rule 2.11(a). The transcript to which reference is made in the text resulted from that proceeding. Both Adelman and Christy have relied on statements made in the Arbitration Transcript to support their motions. It should be noted here that under Local Rule 2.1 l(i)(8), "[i]n the absence of agreement of the parties and except as related to impeachment of a witness, no transcript of the proceedings shall be admissible in evidence at any subsequent trial de novo of the action.” D. Ariz. Local R. 2.11(i)(8). The Arbitration Transcript, however, can be assumed to indicate what witnesses will testify to at trial or in their depositions in the absence of an agreement to use the Arbitration Transcript. This Court is aware, however, that the statements may not be directly admissible at trial.
 

 [4]
 

 . If the scope of the 1994 Agreement were so limited, the 1992 Agreement could be seen to survive the mere formalization of details that it itself contemplated.
 

 [5]
 

 . For example, if Christy had simply agreed to pay Adelman a 25% royalty as an accord and satisfaction of her original obligation to pay 50% of net profits under the 1992 Agreement.
 

 [6]
 

 . Were the 1992 Agreement to remain in effect, the breach of contract issue would not be eligible for summary judgment regardless, in light of the obvious factual disagreements about whether Adelman provided all research materials to Christy or whether she simply "disappeared.” Disputed material issues of fact would remain.
 

 Although Christy has not moved for summary judgment on the 1992 Agreement, the Court’s analysis compels the conclusion that the alleged breach of the 1992 Agreement, by any party, will
 
 not
 
 be an issue at trial. All duties, rights and claims arising under that contract were extinguished by the parties’ execution of the 1994 Agreement.
 

 [7]
 

 . Adelman has not alleged that Christy ever had direct access to the bibliography itself. It was registered with the Copyright Office
 
 after
 
 the commencement of this suit, and the date of its creation remains unstated in the record. For purposes of this analysis, however, this Court accepts Adelman's allegations that Christy has all of Adelman’s urine therapy materials in her possession as an allegation that Christy also had access to the bibliography.
 

 [8]
 

 . This Court has held that the 1994 Agreement is the only agreement under which the parties may claim rights.
 
 See supra
 
 TV A.2. That holding, however, is not necessary foi the resolution of Adelman’s unjust, enrichment claim. The existence of either agreement is sufficient.
 

 [9]
 

 . The measure for unjust enrichment is the value of the goods or services conferred upon the other party, not the plaintiff’s expected benefit from the contract promises.
 
 See
 
 Restatement (First) of Restitution § 107 cmt. b (1935). Here, the value of Adelman's ser-viccs in compiling her sources or making promotional inquiries may be less than the bargained-for value of her royalties and copyright co-ownership in the resulting book, depending largely on the commercial success of the book.
 

 [10]
 

 . Indeed, even if Adelman is held at trial to have breached the 1994 Agreement, or if the 1994 Agreement is found to be invalid for a yet-undisclosed reason, she may be entitled to unjust enrichment for the value of whatever services she did perform.
 

 [11]
 

 . Should Adelman be able to show at trial interference with her performance, such interference would support her claim for breach. The Court’s ruling here that independent promotion alone cannot, without more, be a basis for breach does not preclude a finding of actual interference.
 

 [12]
 

 . Furthermore, the printout states "Last A/R Filed: 3/1995.”